UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DR. THOMAS J. KIEBACH, *ET. AL.* | * | CIVIL ACTION NO. _____ |
| | * | |
| VERSUS | * | JUDGE _____ |
| | * | |
| PERSHING, LLC | * | MAGISTRATE _____ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT AND MOTION TO VACATE ARBITRATION AWARD

**NOW INTO COURT**, through undersigned counsel, comes Petitioners, **Dr. Thomas J. Kiebach, *et al.***, who hereby present this Complaint and Motion to Vacate the Arbitration Award rendered November 3, 2014, and respectfully represent as follows:

### THE PARTIES

1.      Petitioners are a group of eighty-four (84) persons of full age of majority and who are the named Petitioners in the Financial Industry Regulatory Authority ("FINRA") Arbitration bearing Docket No. 13-01692 that was held on October 6-9 and 13-16, 2014 ("FINRA Arbitration Proceeding") as follows (the "Petitioners"):

a.      **Dr. Thomas Kiebach**, deceased, now represented by the Executory of his estate, **Thomas J. Moran**, an individual of full age of majority, domiciled and residing at 737 Highlandia Drive, Baton Rouge, Louisiana 70810;[1]

b.      **Mamie C. Sanchez, as power of attorney for Mamie Helen Baumann**, an individual of full age of majority, domiciled and residing at 4580 Drusilla Drive, Baton Rouge, Louisiana 70809;

c.      **Royce E. Beauchamp**, an individual of full age of majority, domiciled and residing at 5433 Hidden Ridge Lane, Baton Rouge, Louisiana 70816;

---

[1] Dr. Thomas Kiebach passed away on November 10, 2014. Thomas J. Moran has been appointed as the independent administrator of the Kiebach Estate by judicial order dated November 24, 2014.

     d.     **Joseph Becker**, an individual of full age of majority, domiciled and residing at 40197 River Winds Court, Gonzales, Louisiana  70737;

     e.     **Ameritrust Corporation, as Trustee on behalf of the Benton B. Johnson Test TR II**, a corporation domiciled and doing business at 4506 S. Harvard Ave., Tulsa, Oklahoma 74135;

     f.     **Ameritrust Corporation, as Trustee on behalf of the Benton Bruce Johnson Trust #1**, a corporation domiciled and doing business at 4506 S. Harvard Ave., Tulsa, Oklahoma 74135;

     g.     **Ameritrust Corporation, as Trustee on behalf of Martha JC Johnson Gen Skpg Tr,**, a corporation domiciled and doing business at 4506 S. Harvard Ave., Tulsa, Oklahoma 74135;

     h.     **Terence Beven**, an individual of full age of majority, domiciled and residing at 3855 Floyd Drive, Baton Rouge, Louisiana  70808;

     i.     **Linda Boyd**, an individual of full age of majority, domiciled and residing at 3213 St. Ann, Zachary, Louisiana  70791;

     j.     **Jerry Burris**, an individual of full age of majority, domiciled and residing at 7851 Lazy Oaks Circle, Denham Springs, Louisiana  70726;

     k.     **Anita Ellen Carter**, an individual of full age of majority, domiciled and residing at 3800 Placid Lane, Lake Charles, Louisiana  70605;

     l.     **Jim Chisholm**, an individual of full age of majority, domiciled and residing at 1967 W. Magna Carta Place, Baton Rouge, Louisiana  70815;

     m.     **Patrick Comeaux**, an individual of full age of majority, domiciled and residing at 3024 Lake Forest Parks, Baton Rouge, Louisiana  70816;

n.      **Kevin R Courville**, an individual of full age of majority, domiciled and residing at 19471 Arcadian Shores, Baton Rouge, Louisiana 70809;

o.      **Monica Courville**, an individual of full age of majority, domiciled and residing at 19471 Arcadian Shores, Baton Rouge, Louisiana 70809;

p.      **Mallory (Paige) Chastant D'Amore**, an individual of full age of majority, domiciled and residing at 114 Pinecrest Drive, Greenwood, South Carolina 29649;

q.      **Ralph D'Amore**, an individual of full age of majority, domiciled and residing at 114 Pinecrest Drive, Greenwood, South Carolina 29649;

r.      **Carolyn H. Daniel**, an individual of full age of majority, domiciled and residing at 12402 Daniel Lane, Welsh, Louisiana 70591;

s.      **Kenneth F. Daniel**, an individual of full age of majority, domiciled and residing at 12402 Daniel Lane, Welsh, Louisiana 70591;

t.      **Roderick Danielson**, an individual of full age of majority, domiciled and residing at 1501 Marshall, Houston, Texas 77006;

u.      **William Dawson**, an individual of full age of majority, domiciled and residing at 40174 Dove Estates, Gonzales, Louisiana 70737;

v.      **Wallace L. Dehay**, an individual of full age of majority, domiciled and residing at 1501 Marshall, Houston, Texas 77006;

w.      **Fred Demarest**, an individual of full age of majority, domiciled and residing at 5822 Lake Shadow Drive, Baton Rouge, Louisiana 70817;

x.      **Cindy Dore**, an individual of full age of majority, domiciled and residing at 404 Briargate, Lafayette, Louisiana 70503;

y.    **Marcel Dumestre**, an individual of full age of majority, domiciled and residing at 545 10th Street South, Minneapolis, Minnesota  55404;

z.    **Margaret Dumestre**, an individual of full age of majority, domiciled and residing at 545 10th Street South, Minneapolis, Minnesota  55404

aa.    **Leah Farr**, an individual of full age of majority, domiciled and residing at 3040 Madeira Drive, Baton Rouge, Louisiana  70810;

bb.    **Martin J. Fischer**, an individual of full age of majority, domiciled and residing at 839 High Lake Drive, Baton Rouge, Louisiana  70810;

cc.    **G. Kendall Forbes**, an individual of full age of majority, domiciled and residing at 222 Granville Court, Baton Rouge, Louisiana  70810;

dd.    **Cindy L. Gentry**, an individual of full age of majority, domiciled and residing at 13510 Shurlin Place, Cypress, Texas  77429;

ee.    **Tommy G. Gentry**, an individual of full age of majority, domiciled and residing at 13510 Shurlin Place, Cypress, Texas  77429;

ff.    **May Giambrone**, an individual of full age of majority, domiciled and residing at 4724 Highway 308, Napoleonville, Louisiana  70390;

gg.    **Lynn Gildersleeve**, an individual of full age of majority, domiciled and residing at 2337 Myrtle Avenue, Baton Rouge, Louisiana  70806;

hh.    **Robert Gildersleeve**, an individual of full age of majority, domiciled and residing at 3123 Tidal Bay Lane, Virginia Beach, Virginia  23451;

ii.    **Gordon Gill**, an individual of full age of majority, domiciled and residing at 2234 Robinhood, Houston, Texas  77005;

jj.    **Nancy Gill**, an individual of full age of majority, domiciled and residing at 2234 Robinhood, Houston, Texas  77005;

kk.    **Jon K. Goeckel**, an individual of full age of majority, domiciled and residing at 4412 Pine Ridge, Baton Rouge, Louisiana  70809;

ll.    **Loretta B. Goeckel**, an individual of full age of majority, domiciled and residing at 4412 Pine Ridge, Baton Rouge, Louisiana  70809;

mm.    **Jason Graham**, an individual of full age of majority, domiciled and residing at 17852 Five Oaks Drive, Baton Rouge, Louisiana  70810;

nn.    **Robert Graham**, an individual of full age of majority, domiciled and residing at 17617 Heritage Estates Drive, Baton Rouge, Louisiana  70810;

oo.    **Dr. Charles Gruenwald**, an individual of full age of majority, domiciled and residing at 2714 Bocage Blvd., Baton Rouge, Louisiana  70809;

pp.    **Barney L. Hallman**, an individual of full age of majority, domiciled and residing at 1810 N. 7th St., Alpine, Texas  79830;

qq.    **Patrick Haney**, an individual of full age of majority, domiciled and residing at 17918 Cascades Avenue, Baton Rouge, Louisiana  70810;

rr.    **Charles Hart**, an individual of full age of majority, domiciled and residing at 126 Mallard Landing, Ferriday, Louisiana  71334;

ss.    **Patsy Hebert**, an individual of full age of majority, domiciled and residing at 14138 LeeAnne Drive, Baton Rouge, Louisiana  70818;

tt.    **John R. Hutcherson**, an individual of full age of majority, domiciled and residing at 1305 Comanche Street, Deer Park, Texas  77536;

uu.    **Donald H. Kenaley**, an individual of full age of majority, domiciled and residing at 18416 Lake Stream Drive, Greenwell Springs, Louisiana 70739;

vv.    **Don Landers**, an individual of full age of majority, domiciled and residing at 18329 E. Village Way Drive, Baton Rouge, Louisiana 70810;

ww.    **Daniel Landry**, an individual of full age of majority, domiciled and residing at 135 Bayou Side, Napoleonville, Louisiana 70390;

xx.    **Dianna Landry**, an individual of full age of majority, domiciled and residing at 135 Bayou Side, Napoleonville, Louisiana 70390;

yy.    **Merrill Laplante**, an individual of full age of majority, domiciled and residing at 339 Delgado Drive, Baton Rouge, Louisiana 70808;

zz.    **Ruth G. Lessing**, an individual of full age of majority, domiciled and residing at 10144 Hyde Park Court, Baton Rouge, Louisiana 70806;

aaa.    **Greg Magee**, an individual of full age of majority, domiciled and residing at 7715 River Ridge Drive, Denham Springs, Louisiana 70706,

bbb.    **Ronald Marston**, an individual of full age of majority, domiciled and residing at 18664 Amen Corner Ct., Baton Rouge, Louisiana 70810;

ccc.    **Jean Anne Mayhall**, an individual of full age of majority, domiciled and residing at 78294 Oak Ridge Road, Folsom, Louisiana 70437;

ddd.    **Jean Anne Mayhall and John Wade on behalf of Microchip ID Systems Pension Fund**, persons of full age of majority, domiciled and residing at 78294 Oak Ridge Road, Folsom, Louisiana 70437;

eee.    **Kathleen Melilli**, an individual of full age of majority, domiciled and residing at 12754 Glenhaven Drive, Baton Rouge, Louisiana 70815;

6

fff.   **Jacqueline Millet**, an individual of full age of majority, domiciled and residing at 7851 Lazy Oaks Circle, Denham Springs, Louisiana  70726;

ggg.   **Bobby Nix**, an individual of full age of majority, domiciled and residing at 82 N. Hills Drive W., Carriere, Mississippi  39426;

hhh.   **Margaret Nix**, an individual of full age of majority, domiciled and residing at 82 N. Hills Drive W., Carriere, Mississippi  39426;

iii.   **Kirk R. Oliver**, an individual of full age of majority, domiciled and residing at 4631 Valley Ridge Road, Dallas, Texas  75220;

jjj.   **Mary C. Oliver**, an individual of full age of majority, domiciled and residing at 4631 Valley Ridge Road, Dallas, Texas  75220;

kkk.   **Arthur Ordoyne**, an individual of full age of majority, domiciled and residing at 25831 Royal Troon, Denham Springs, Louisiana  70726;

lll.   **Lonnie Ordoyne**, an individual of full age of majority, domiciled and residing at 515 Highway 20, Thibodeaux, Louisiana  70301;

mmm. **Bennie O'Rear**, an individual of full age of majority, domiciled and residing at 2416 St. Regis Drive, Baton Rouge, Louisiana  70816, and on behalf of Claudia O'Rear;

nnn.   **Mary Ann Paternostro**, an individual of full age of majority, domiciled and residing at 20 Spanish Fort Blvd., New Orleans, Louisiana  70124;

ooo.   **Lynn Phillipe**, an individual of full age of majority, domiciled and residing at 17538 Amelia Drive, Baton Rouge, Louisiana  70810;

ppp.   **Power Packing Co. Inc. Agency**, a Louisiana corporation authorized to do business and doing business in Louisiana at 2769 Mission Drive, Baton Rouge, Louisiana  70805;

qqq.   **Monroe J. Rathbone, IV**, an individual of full age of majority, domiciled and residing at 6806 Island Circle, Midland, Texas 79707;

rrr.   **Dr. Richard Rathbone**, an individual of full age of majority, domiciled and residing at 15107 Memorial Tower Drive, Baton Rouge, Louisiana 70810;

sss.   **James Roland**, an individual of full age of majority, domiciled and residing at 4966 Rosemound Loop, St. Francisville, Louisiana 70775;

ttt.   **Susan Roland**, an individual of full age of majority, domiciled and residing at 4966 Rosemound Loop, St. Francisville, Louisiana 70775;

uuu.   **Jessie Romig**, an individual of full age of majority, domiciled and residing at 18035 Bayou Road, Grosse Tete, Louisiana 70740;

vvv.   **Julie Savoy**, an individual of full age of majority, domiciled and residing at 45349 Stringer Bridge Street, St. Amant, Louisiana 70774;

www.   **Robert Schwendimann**, an individual of full age of majority, domiciled and residing at 7246 Angus Avenue, Zachary, Louisiana 70791;

xxx.   **Bruce P. Smith**, an individual of full age of majority, domiciled and residing at 7700 Belmont Drive, St. Francisville, Louisiana 70775;

yyy.   **Harriett Smith**, an individual of full age of majority, domiciled and residing at 4821 Sharp Road, Mandeville, Louisiana 70471, and on behalf of G. Rogers Smith;

zzz.   **Robert Smith**, an individual of full age of majority, domiciled and residing at 6140 Tezcuco Court, Gonzales, Louisiana 70737;

aaaa.   **Rodney Starkey**, an individual of full age of majority, domiciled and residing at 18016 Highland Drive, Independence, Louisiana 70443;

bbbb.  **Carol H. Stegall**, an individual of full age of majority, domiciled and residing at 10843 Ramblewood Drive, Baton Rouge, Louisiana 70810;

cccc.  **James Stegall**, an individual of full age of majority, domiciled and residing at 10843 Ramblewood Drive, Baton Rouge, Louisiana 70810;

dddd.  **Walter Bruce Stone**, an individual of full age of majority, domiciled and residing at 530 Shady Lake Pkwy., Baton Rouge, Louisiana 70810;

eeee.  **Terry Tarver**, an individual of full age of majority, domiciled and residing at 14308 Hwy. 10, Clinton, Louisiana 70722;

ffff.  **Gail Unglesby**, an individual of full age of majority, domiciled and residing at 14415 Highland Road, Baton Rouge, Louisiana 70810;

gggg.  **Lewis Unglesby**, an individual of full age of majority, domiciled and residing at 14415 Highland Road, Baton Rouge, Louisiana 70810;

hhhh.  **John Wade**, an individual of full age of majority, domiciled and residing at 81447 Highway 25, Folsom, Louisiana 70437;

iiii.  **Charles White**, an individual of full age of majority, domiciled and residing at 139 Penny Drive, Dry Prong, Louisiana 71423;

jjjj.  **Ken Wilkewitz**, an individual of full age of majority, domiciled and residing at 13680 Milldale Road, Zachary, Louisiana 70791;

kkkk.  **Stephen Wilson**, an individual of full age of majority, domiciled and residing at 701 Hennessey Blvd, Suite 200, Baton Rouge, Louisiana 70808;

llll.  **Martha Witmer**, an individual of full age of majority, domiciled and residing at 5008 Summa Court, Baton Rouge, Louisiana 70809; and

mmmm.        **Sharon Witmer**, an individual of full age of majority, domiciled and

residing at 530 Shady Lake Parkway, Baton Rouge, Louisiana 70810.

2.        Made respondent herein is **PERSHING LLC** ("Pershing" or "Respondent"), a

Delaware limited liability company and a registered Financial Industry Regulatory Authority

("FINRA") member broker/dealer authorized to conduct business and doing business in the State

of New York.  Pershing can be served through its registered agent for service of process in New

York, Corporation Service Company, 80 State Street Suite 6, Albany, NY 12207-2543.

## JURISDICTION AND VENUE

3.        Jurisdiction is proper in this Court as there is complete diversity pursuant to 28

U.S.C. §1332.

4.        Venue is proper in this District pursuant to 9 U.S.C. § 9 and 28 U.S.C. § 1391.  *See*

*also* FINRA Rule 12904(a). *Also see Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S.

193, 203-04, 120 S. Ct. 1331, 1339 (2000).

5.        Section 25 of the Customer Agreement which is the subject in this litigation and

contains the arbitration provision states the following:

> **The Laws of the State of New York Govern**
> ***This agreement and its enforcement shall be governed by the laws of the state***
> ***of New York without giving effect to its conflict of laws provisions.***

## THE FINRA ARBITRATION[2]

---

[2] The factual information set forth in this pleading is based upon public information obtained from multiple sources including the SEC Enforcement Proceeding entitled *In the Matter of Daniel Bogar, Bernerd E. Young, and Jason T. Green*, SEC Administrative Proceeding #3-15003.  A representative of Pershing testified in that proceeding on February 13, 2014, which information was obtained under the Freedom of Information Act.  In addition, quotes from the volumes of testimony and the exhibits introduced at the arbitration proceeding have not been included in this pleading but will be the subject of the Memorandum in Support of the Complaint and Motion to Vacate that will initially be filed under seal.  Over the express objection of counsel for Petitioners based upon the guidelines of the American Bar Association, Ms. O'Brien ordered undersigned counsel to sign a Confidentiality Order on March 14, 2014. Until the Court can determine the scope and validity of the Confidentiality Order, the testimony and documents

6.     This claim arises out of the Allen Stanford Ponzi scheme, which is the second largest Ponzi scheme in the history of the United States. Investors like Petitioners lost over $7 Billion. To date, only 1.4% of the amount of the investor losses have been paid to Petitioners because no assets existed at Stanford International Bank ("SIB"), which sold worthless certificates of deposit (the "SIB CDs") to the Petitioners and others, mostly through SIB's related broker dealer, Stanford Group Company ("SGC"). *Chadbourne & Parke, LLP v. Troice*, 571 U.S. __, 134 S.Ct. 1058 (2014) ("*Chadbourne*"). Pershing was the clearing broker for SGC, who sold the SIB CDs.

7.     The form written customer agreement prepared by Pershing that Petitioners executed required all 84 petitioners to arbitrate their claims under FINRA Rule 12200.  The inherent unfairness, bias, and manifest disregard of the law created by this unilaterally chosen method of resolving this claim when FINRA's conduct was also the focus of the Stanford Ponzi scheme is the basis for this motion to vacate.

8.     Petitioners filed a Statement of Claim against Pershing on June 6, 2013. (**Exhibit 1**).[3]

9.     Michele O'Brien, Mario Alberto Arteaga, Jr., and Brian P. Jakes, Sr. were appointed by FINRA as arbitrators on January 9, 2014 (the "Panel") though the process designated under the FINRA Rules. Ms. O'Brien was the Panel Chairperson.

---

obtained in the arbitration proceeding are being filed under seal as exhibits to the Memorandum pursuant to 9 U.S.C. § 6. Petitioners will initially file their Memorandum in Support of Complaint and Motion to Vacate under seal but will promptly move the Court to make the documents public based upon existing law, the manner the execution of the Confidentiality Order was coerced by the panel, and the fact most if not all of the information is public based upon the testimony of Mr. John Ward in the SEC Enforcement Proceeding entitled *In the Matter of Daniel Bogar, Bernerd E. Young, and Jason T. Green*, SEC Administrative Proceeding #3-15003.

[3] Petitioners' First Amended Statement of Claim was filed on June 27, 2013 to add the following parties: Ruth G. Lessing, Ruth G. Lessing IRA, Kevin R. Courville, and Monica Courville.

10.     The FINRA Arbitration Proceeding was held in New Orleans, Louisiana on October 6-9 and 13-16, 2014.  By order of the Panel, the Arbitration Proceeding was closed on October 27, 2014 at 5:00 p.m., which was the last date any submission could be made to the Panel.[4]

11.     The 85 Petitioners herein had losses totaling $45,787,020.53 in principal amount as established by the Receiver of the Stanford Estate, Ralph S. Janvey.

12.     Many of the Petitioners were parties in the United States Supreme Court case of *Chadbourne*, which allowed negligence claims under state law against persons that support or enable a Ponzi scheme and provide assistance in the offering of securities. These arbitration claims were the first case tried against persons, like Pershing, after *Chadbourne*.[5] Its holding was totally ignored by the Panel.

13.     Pershing and SGC began considering the possibility that Pershing would become the clearing broker for SGC in April 2005. In July 2005, representatives of Stanford went to Antigua to review the operations of Stanford International Bank ("SIB") after it learned that two-thirds of the income of SGC was commissions paid by SIB. Pershing and SGC executed a clearing agreement in December 2005. SIB and SGC were both totally owned by Allen Stanford.

14.     During the time period of July 2005 until February 2009, Pershing knew that the introducing broker, SGC, was losing substantial money each month, but allowed Allen Stanford to prop up SGC by injecting millions of dollars of capital contributions to SGC, which was responsible for selling the SIB CD that perpetuated the Ponzi scheme.

---

[4] Pershing has filed a "Complaint in the form of a Motion to Confirm" in the United States District Court for the Eastern District of Louisiana in Action No. 14-CV-02549. Petitioners have filed a motion to dismiss this proceeding.

[5] Undersigned counsel represented many of these petitioners before the United States Supreme Court in the *Chadbourne* case. After all of the time and expense in pursuing the legal issue to the United States Supreme Court, the ruling was essentially ignored by the FINRA arbitration panel. *Chadbourne* allows a claim for Pershing negligently performing due diligence in connection with the sale of a security under the state securities law without being required to prove recklessness or knowledge of the fraud or Ponzi scheme. *See* Counts 3 (La. Securities law) and 4 (Tex. Securities law) of Petitioners' Statement of Claim. (**Exhibit 1**).

15.     The decision was made by the highest levels of Pershing management during the four year relationship between April 2005 and February 2009 not to require Allen Stanford to answer the Red Flag questions concerning two-thirds of the income of SGC that was being paid by an entity in Antigua to a United States broker dealer regulated by FINRA or to find out what underlying assets owned by SIB were producing the foreign source income.

16.     The Panel willfully and intentionally ignored the *Chadbourne* case and the USA PATRIOT ACT, Pub. L. 107-56, 115 Stat. 272 (the "Patriot Act"), in denying Petitioners' claims, without any reasons or opinion, when Petitioners showed overwhelming evidence that Pershing's conduct violated the Patriot Act and its duties to Petitioners while at all times financially benefiting themselves to the detriment of Petitioners.

17.     The arbitrators were biased because Pershing made the failure of FINRA to properly perform its regulatory and supervisory function to SGC, a United States broker dealer, its primary defense in the case ("FINRA Defense"), arguing that because FINRA did not discover the Stanford Ponzi scheme, Pershing had no obligation to perform any higher standard of conduct than FINRA.

18.     For the Panel to determine that Pershing was liable, the Panel would have had to also determine FINRA did not perform its regulatory function in reviewing the operations of SGC. This arbitration was the first of many that may expose Pershing to losses totaling $7 billion associated with the Stanford Ponzi scheme and had significant and substantial ramifications to FINRA and the clearing broker industry if it resulted in an adverse judgment. The FINRA Defense, injected by Pershing, created a conflict that resulted in inherent unfairness to Petitioners.

19.     While the FINRA Defense ignores the obligation that Pershing had to comply with the Patriot Act and AML and creates an excuse for non-performance of its due diligence

obligations based upon the standard of performance by FINRA, it also created an irresolvable conflict, bias and prejudice between the Petitioners and FINRA so that Petitioners did not receive a fair hearing. By tying its own duty and conduct to the actions of FINRA, Pershing put FINRA's actions on trial, the same entity that regulated the arbitrators, their qualifications, their future appointments, and the hearing.

20.     Due to the magnitude and complexities of the claims made against Pershing, Petitioners made an independent request that the Panel chair issue an explained decision per Rule 12904(g) and acknowledged that Petitioners would be solely responsible for the costs associated with the Panel authoring an explained decision on September 15, 2014. On September 16, 2014, the Panel denied Petitioners' independent Rule 12904(g) request.

21.     Even though the Supreme Court of the United States had time to write an opinion on this important legal matter, the Panel gave short shrift to their duty by issuing a one line decision, stating "Petitioners' claims are denied in their entirety." (**Exhibit 2**, the "Award")

22.     In fact, no written opinion could be authored by the Panel that would have reconciled two conflicting positions—the Panel's desire to protect FINRA's institutional examination and supervisory process in the Stanford Ponzi scheme versus the demonstrated fact that Pershing violated the Patriot Act, its own internal policies on the proper AML due diligence on an introducing broker, and the Louisiana securities law.

## BIAS OF ARBITRATION PANEL

23.     The arbitrators were biased because Pershing made the failure of FINRA to properly perform its regulatory and supervisory function of SGC, a United States broker dealer, its primary defense in the case, arguing that because FINRA did not discover the Stanford Ponzi Scheme, Pershing had no obligation to be held to a higher standard of conduct than FINRA.

24.     Pershing voluntarily injected FINRA's conduct into the trial in its opening statement, and the standard of conduct of FINRA became its primary defense. Pershing essentially argued, despite the clear rule of law established in the United States Supreme Court case of *United States v. Gaubert,* 499 U.S. 315, 326 (1991) ("*Gaubert*"),[6] that it should have no liability because FINRA and the SEC had a greater responsibility than Pershing did, and because they did not discover the problem, Pershing cannot be held accountable for violating its duties to Petitioners. This argument was designed to circumvent specific duties established by *Chadbourne* and the Patriot Act.

25.     This argument is inherently unfair and created substantial bias because all courts that have considered the matter have not allowed Petitioners to hold the same entities accountable and the law universally holds that entities like Pershing are not allowed to use this type of negligence as a defense to the performance of their own legal duties.

26.     Pershing's decision, in its sole discretion, to inject the FINRA Defense into the proceeding to circumvent the duties it owed Petitioners as a matter of law, created institutional bias and a conflict of interest for the Panel. The arbitrator's relationship with FINRA, consisting of training, appointment to various arbitration panels, and payment of professional fees squared off against FINRA's role in not timely discovering the Ponzi scheme. Once Pershing asserted the FINRA Defense, Pershing asked the Panel to "bite the FINRA hands that feed them," and created bias and a conflict of interest. This institutional bias manifested itself in the following unexplained decisions by the Panel:

(i)     Pershing asserted the attorney-client privilege on a number of documents based upon the fact that Pershing's in-house counsel was also responsible for performing

---

[6] Pershing cannot show the "fault" of the SEC because the SEC does not owe any duty to Petitioners or Pershing based upon the seminal United States Supreme Court case of *United States v. Gaubert,* 499 U.S. 315, 326 (1991).

due diligence on SIB by traveling to Antigua in the summer of 2005 and in January 2008. Petitioners requested Ms. O'Brien, the Panel Chair, to perform an *in camera* review of these documents. Ms. O'Brien declined Petitioners' request, refused to review these documents as requested by Petitioners and erroneously assumed the accuracy of the privilege log without reviewing the documents.[7] Ms. O'Brien's acceptance of Pershing's justification for not producing certain alleged "attorney client documents" without first conducting a review of the documents to see whether they fell into a privileged category shows institutional bias in favor of the Pershing and its officers because of the "assumed veracity" of Pershing.

(ii)     Pershing did not produce internal documents relating to its decision not to require SGC to provide information needed by Pershing to comply with the Patriot Act and Pershing's own AML policy. Petitioners requested that Ms. O'Brien perform an *in camera* review of the AML Documents[8] to determine their relevancy to Pershing's

---

[7] The attorney client privilege does not extend to a witness' knowledge of any particular facts. *Upjohn Co. v. U.S.*, 449 U.S. 383, 395-396, 101 S.Ct. 677, 685-686, 66 L.Ed.2d 584 (1981). Further, the attorney-client privilege protects only legal advice—not economic, business, or policy advice. *Fox News Network, LLC v. U.S. Department of The Treasury*, 739 F.Supp.2d 515, 560 (S.D.N.Y. 2010). Any economic, business, or policy advice rendered by in house counsel is not protected by the privilege. *Immersion Corporation v. HTC Corporation*, 2014 WL 3948021, *1 (D.Del. Aug. 7, 2014). Any participation by in house counsel in connection with a "normal business" practice of investigating normally recurring matters is not subject to the attorney client privilege. *National Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. TransCanada Energy USA, Inc.*, 2014 WL 3744446, *1 (N.Y.A.D. 2014); *Guzzino v. Felterman*, 174 F.R.D. 59, 62 (W.D.La. 1997); *Wultz v. Bank of China Ltd.*, 979 F.Supp.2d 479, 496 (S.D.N.Y. 2013) The information contained in the correspondence that does not relate to a specific request for legal advice from in house counsel is not subject to the privilege and does not insulate the entire correspondence from discovery. "Privilege does not apply to an internal corporate investigation made by management itself." *Wultz v. Bank of China Ltd.*, 979 F.Supp.2d 479, 496 (S.D.N.Y.2013). Further Pershing is required to show that email to and from in house counsel is "predominately" related to legal advice. *Koumoulis v. Independent Financial Marketing Group, Inc.*, 295 F.R.D. 28, 37 (E.D.N.Y.2013).

[8] "AML Documents" refers to the documents which support the underlying facts in the SARS report and the documents evidencing the review conducted by Pershing of SIB and SGC. Petitioners and Pershing agree that the SARS reports, themselves, are privileged as a matter of law and cannot be produced in civil litigation. However, the question presented by the AML Documents is whether the underlying facts and documents evidencing a review conducted by Pershing are subject to production.

knowledge of non-compliance with the act and why certain known questions were not answered by Mr. Stanford. Once again, Ms. O'Brien failed to perform a review of these documents as requested by Petitioners and erroneously assumed the veracity and truthfulness of Pershing without reviewing a single document and without requiring Pershing to specifically list which documents it is withholding on the grounds of the mythical AML privilege, despite FINRA Rule 12508[9] requiring a specific listing. Ms. O'Brien's acceptance of Pershing's justification for not producing AML documents without first conducting a review of the documents to see whether they fell into a privileged category shows institutional bias in favor of the Pershing and its officers because of the "assumed veracity" of Pershing.

(iii)   Mr. YYY,[10] who was Chief Executive Officer of Pershing during 2005 to 2009 was a key witness in this proceeding because of his involvement in the SGC relationship from inception to termination. Mr. YYY also served the FINRA Board of Governors as the "Large Firm Governor" and "Lead Governor" at various times during 2007 through 2011.  Ms. O'Brien showed favoritism to Mr. YYY and did not force his personal attendance at the hearing despite the importance of this hearing, the fact date of the hearing was set on February 6, 2014 and he was noticed on August 28, 2014 that he would be the first witness called in the arbitration beginning on October 6, 2014, and a prior Panel Order dated September 12, 2014 commanding the personal appearance of Mr. YYY.

---

[9] FINRA Rule 12508(a) states, "If a party objects to producing any document described in Document Production Lists 1 or 2 or any document or information requested under Rule12507 it *must specifically identify* which document or requested information it is objecting to and why." (Emphasis added).

[10] "Mr. YYY" will be identified in the Memorandum in Support of Complaint and Motion to Vacate Arbitration Award.

(iv)     The scope of the discovery was limited by Ms. O'Brien to only documents in possession of Pershing. Ms. O'Brien would not allow discovery of Bank of New York documents relating to the Stanford Ponzi scheme even though the Bank of New York, as Pershing's parent company, were extensively involved in the relationship.

(v)      Despite the request of counsel, Ms. O'Brien never ordered Pershing to list out for Petitioners the documents Pershing withheld from production as required by Rule 12508(a) or require Pershing to certify that it had produced all documents or that no documents had been destroyed.[11] Ms. O'Brien essentially took Pershing at its word every step of the way without requiring independent accountability to the finder of facts. She assumed from the very beginning that Pershing's veracity was unquestionable and that it was telling the truth, in spite of FINRA's crystal clear rules on the discovery obligations of a FINRA regulated entity as set out in the Discovery Guide.[12] This Pershing veracity was assumed during discovery and carried over to the trial.

---

[11] In addition to the requirements set forth in FINRA Rule 12508(a), FINRA Discovery Guide also requires:

> "If a party responds that there are no responsive documents in the party's possession, custody, or control, the appropriate person in the brokerage firm who has knowledge, upon the request of the party seeking the documents, must: 1) state in writing that the party conducted a good faith search for the requested documents; 2) describe the extent of the search; and 3) state that, based on the search, there are no requested documents in the party's possession, custody, or control.  In appropriate cases, the arbitrators may order a party to provide such affirmations regarding discovery requests for documents beyond those contained in the Discovery Guide."

[12] *See* **Section Two (2) of Rule 12506-Schedule One**, which requires that Pershing produce any communications, whether in the form of a letter or email, that it has sent or received in connection with the "claims." *See also* **Section Three (3) of Rule 12506-Schedule One**, which requires the production of any and all documents relating to Pershing anti-money laundering policies and procedures. *See also* **Section Five (5) of Rule 12506-Schedule One**, which requires the production of any internal evaluation of Stanford even if "documents intended or identified as being "for internal use only."" There is no money laundering exception in the rule. *See also* **Section Seven (7) of Rule 12506-Schedule One**, which requires production of all documents relating the "managerial review" of the transaction alleged

(vi)     Ms. O'Brien did not timely establish timelines for Pershing to produce documents despite the fact the arbitration had been expedited due to the elderly age of a majority of Petitioners. Despite the fact that the documents were requested in November 2013 and Petitioners were forced to file four motions to compel in a six month period, Pershing was allowed to dump 600,000 pages of documents on Petitioners on July 17, 2014, less than two months prior to the start of the hearing. Despite the repeated request of Petitioners for six months, Ms. O'Brien would not establish a time deadline for the documents to be produced which resulted in Pershing dumping 600,000 documents on Petitioners 60 days prior to trial even though they had been requested eight months prior to that date.

(vii)    After review of Pershing's documents, Claimant noted that all AML Documents and credit review documents related to SCG were missing for the time period of October 1, 2006 and June 1, 2006. This was the critical time period in which the $4 billion of assets were transferred from Bear Stearns to Pershing, but the Red Flag questions that had been previously raised were not being answered by SGC. Ms. O'Brien flagrantly disregarding the discovery obligations of FINRA as set forth in the FINRA Discovery Guide and did nothing about it and to date, Petitioners have no idea the volume or substance of these documents—the AML Documents simply vanished into thin air.

---

in the Statement of Claim. There is no money laundering exception in the rule. *See also* **Section Sixteen (16) of Rule 12506-Schedule of Schedule One**, which requires the production of all internal documents that reviewed the transactions including all internal investigations of Pershing and reports rendered by any regulatory agency.[12]  There is no money laundering exception in the rule. *See also* **Section Thirteen (13) of Rule 12506-Schedule One**, which requires the production of all any "internal audits," "exception reports," or "deficiency reports" prepared by Pershing between January 1, 2005 and the current date related to the Statement of Claim. There is no money laundering exception in the rule.

27.     The bias and partiality of the Panel resulted in manifest error by the Panel through its ignoring the uncontested fact that Pershing violated its own AML policy by not performing due diligence on an Introducing Broker and ignoring the duty that a broker has to its customer to refrain from conduct that benefits the broker to the detriment of the customer regardless of what information the broker has.  The law was ignored because of the institutional bias created by the FINRA Defense of Pershing that was asserted against Petitioners that a finding against Pershing would in fact be a finding against FINRA for its failure to supervise SGC and discover the Stanford Ponzi scheme.

28.     The Panel's conflict, bias and prejudice was further intensified by the fact that Mr. YYY served on the FINRA Board of Governors as the "Large Firm Governor" and "Lead Governor" at various times between 2007 to 2011, which is the same time frame of Pershing's relationship with SGC.  Because of this, the tie between FINRA and Pershing at the Arbitration Hearing was further strengthened and caused the Panel to make a choice between FINRA, who is their employer, and the Petitioners.

29.     While this defense ignores the obligation that Pershing had to comply with the Patriot Act and AML, it also created an irresolvable conflict, bias and prejudice between the Petitioners and FINRA so that Petitioners did not receive a fair hearing.  By tying its own duty and conduct to the actions of FINRA, Pershing put FINRA's actions on trial, the same entity that regulated the arbitrators, their qualifications, the hearing and their future appointments.

30.     For the Panel to determine that Pershing was liable, the Panel would have to also determine FINRA did not perform its regulatory function in reviewing the operations of SGC. This arbitration was the first of many that may expose Pershing to losses totaling $7 billion associated with the Stanford Ponzi scheme and had significant and substantial ramifications to FINRA and

the clearing broker industry if it resulted in an adverse judgment. The FINRA Defense, injected by Pershing, created a conflict that resulted in inherent unfairness to Petitioners.

## AML POLICIES OF PERSHING

31.     The facts were uncontested that Pershing violated the Patriot Act and its own AML policy from April 2005 until February 2009 by willfully and intentionally failing to obtain answers to known Red Flags.  The Red Flag Issues and Questions  for the period 2005 to 2009 and the officer involved at Pershing that are the subject of the arbitration are set forth in the Memorandum in support of this Complaint and Motion. The Memorandum in Support of the Complaint and Motion will set forth in detail the testimony of representatives of Pershing and the documents which support the claim. These documents are being filed with the Court under seal and Petitioners are requesting the Court to determine that the documents should not be subject to any confidentiality order. The scope of the arbitration order of the Panel and the public information available will be the subject of the motion not to require the documents and transcripts be filed under seal. The facts set forth herein are public information as set forth in the transcripts of the SEC hearing held from February 11, 2013 through March 1, 2013, entitled *In the Matter of Daniel Bogar, Bernerd E. Young, and Jason T. Green* in Houston, Texas, wherein representatives of Pershing testified as to the scope of their due diligence and admitted the fact that Pershing agreed to serve as the clearing broker of SGC despite the complete lack of transparency on the value of SIB's underlying assets or the source of income and cash flow of SIB. This was the first time its role in perpetuating the Ponzi scheme became public information.  These documents have also been produced in the Arbitration Proceeding entitled *Crowell v Pershing LLC*, FINRA Arb. No. 13-01753. Pershing knew of the Red Flag issues but failed to require Allen Stanford to answer certain key questions.

32.     Section 352 of Patriot Act, 31 U.S.C. § 5318(h), provides the following:

(1) In general.  In order to guard against money laundering through financial institutions, each financial institution shall establish anti-money laundering programs, including, at a minimum-

(A) The development of internal policies, procedures, and controls;

33.     As required by the Patriot Act, Pershing developed AML guidelines, which obviously it felt complied with the Patriot Act. Pershing's AML Policy states that AML due diligence must be performed on Introducing Brokers. Included in this scope of inquiry would be the source of foreign income and an understanding of the underlying assets that were producing the foreign source income received by the Introducing Broker.

34.     This AML Policy first states that it applies to the Introducing Brokers. Pershing and its officers denied throughout the arbitration that it was required to perform AML due diligence on an Introducing Broker.

35.     The proper performance of the required due diligence in 2005 and 2006 could have prevented one of the largest Ponzi schemes in American History.  Even though the uncontested evidence showed Pershing's management had knowledge of these Red Flags, Pershing's highest management did not require Allen Stanford to answer these specific questions mandated by the Patriot Act from July 2005 until February 2009 because of reasons set forth in the Memorandum in Support of the Complaint and Motion to Vacate.

## HISTORY OF ARBITRATION CLAIM

36.     Petitioners sought to recover as damages their losses in the R. Allen Stanford Ponzi scheme in the amount of $80,000,000 based upon the obligations and duties Pershing had to the Customer Petitioners and the obligations Pershing had to comply with the Patriot Act and its own policy on money laundering. Despite the fact that the record is uncontested that the highest

22

officers of Pershing violated the Patriot Act and Pershing's own internal AML polices, the Panel chose to disregard the law and facts and deny without reason or opinion the Petitioners' claims.

37.    Petitioners filed their Statement of Claim on June 6, 2013. The Panel was appointed on January 9, 2014 though the process designated under the FINRA Rules.   The arbitration hearing date was established on February 5, 2014 for October 6-16, 2014. After the Statement of Claim was filed, numerous motions were filed and scheduled for hearing.

38.    At the time of the filing of the Statement of Claim on the Customer Agreement in which they agreed to arbitrate with Pershing, Petitioners were not aware that Pershing would attempt to mitigate its own fault based upon the wrongful conduct of FINRA, the very body regulating the arbitrators, or that it would create a conflict in bias in the proceeding by forcing the arbitrators to hold FINRA accountable if they found liability on the part of Pershing. In fact, this defense was never asserted until opening arguments on October 6, 2014. This was clearly the strategy of Pershing and created an institutional bias in this supposedly objective proceeding. Petitioners certainly were not aware as of the filing of the Statement of Claim that Pershing's veracity was automatically assumed to be truthful, despite what the evidence showed.

## HISTORY OF THE STANFORD PROCEEDINGS

39.    On February 17, 2009, the SEC brought suit against Stanford Group Company, along with various other Stanford corporate entities, including SIB, for allegedly perpetrating a massive Ponzi scheme. As part of this Ponzi scheme, the Petitioners purchased the SIB CDs, which were worthless certificates of deposit issued by SIB, a bank chartered, located and operated in Antigua. After suit was brought by the SEC, the district court appointed Ralph S. Janvey as the

Receiver of the Stanford companies to marshal, conserve, hold, manage and preserve the value of the receivership estate.[13]

40.    After the receivership was established, many of the Petitioners filed suit against the investment advisors. A limited number of suits were filed against the companies like Pershing that did business with Allen Stanford and the Stanford entities. Most of the lawsuits were transferred to the MDL proceeding in the Northern District of Texas before the Honorable David Godbey. One of the key issues that arose from the MDL proceeding is whether Petitioners can file a suit under state law against entities like Pershing based upon a negligence theory of failure to perform the proper due diligence of the Stanford entities. It was ultimately decided in favor of Petitioners in the case of *Roland, et. al. v. Green, et al.*, 675 F. 3d 503 (5th Cir. 2012), at the United States Court of Appeals for the Fifth Circuit and the United States Supreme Court in the case of *Chadbourne*. Many of the persons that were Petitioners in this arbitration proceeding were also plaintiffs and Appellants in the *Chadbourne* case. For that reason alone, it is hard to believe the Panel could ignore the law established by five years of litigation arising out of the *Chadbourne* decision by the highest court in the land.

## STANFORD ENTITIES

41.    The issuer of the certificates of deposit was Stanford International Bank located in Antigua. Stanford Group Company was a United States broker dealer regulated by the Securities and Exchange Commission. Two-thirds of the gross income received by SGC was from

---

[13] The legal issues arising from the receivership have been the subject of multiple appeals to this court. The underlying facts of the Stanford Ponzi scheme are set out in *S.E.C. v. Stanford Intern. Bank Ltd.*, 2011 WL 1758763, 1 (5th Cir. 2011); *Janvey v. Alguire*, 628 F.3d 164, 168 (5th Cir. 2010); *Janvey v. Adams,* 588 F.3d 831 (5th Cir. 2009); *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 567 (5th Cir. 2010), and *Janvey v. Alguire*, 647 F.3d 585, 591 (5th Cir. 2011).

commissions paid by SIB for the sale of the SIB CDs. SIB and SGC were both owned by Allen Stanford.

42.   Bear Stearns was the original clearing broker for SGC and held approximately $4 billion of SGC customer accounts. In April 2005, Stanford approached Pershing with the proposal that Pershing become its new clearing broker for four branches, and if it did a good job, Stanford would transfer the $4 billion of assets held at Bear Stearns after the initial trial period. In December 2005, Pershing began as clearing broker for a limited number of accounts in the four branches. In April 2006, Pershing was advised by Stanford that Stanford would transfer all of the $4 billion of accounts from Bear Stearns to them once the computer work was completed. During the next eight months, Pershing worked on putting these accounts on their computer system, with the actual transfer of the $4 billion of assets held by Bear Stearns occurring in December 2006.

## THE PONZI SCHEME

43.   On February 17, 2009, the SEC brought suit against Stanford Group Company, along with various other Stanford corporate entities, including SIB, for allegedly perpetrating a massive Ponzi scheme.

44.   The Ponzi Scheme existed from 1999, as determined by the Fifth Circuit Court of Appeals in *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 198-199 (5th Cir. 2013), where the court stated the following:

> [T]he guilty plea and re-arraignment statements of James M. Davis ("Davis"), Stanford's Chief Financial Officer, determined that the Stanford Ponzi scheme began and was insolvent as early as 1999 and that it was continuously operated in this manner and condition until it began to unravel in October 2008.
>
> Stanford and Davis were prosecuted for and convicted of numerous federal offenses in their operation of the Ponzi scheme and are currently serving federal prison sentences.

On August 27, 2009, Davis was re-arraigned and pleaded guilty to a number of offenses, the basic elements of which were that he knowingly defrauded investors who purchased CDs from SIBL and that he also conspired to obstruct an SEC investigation into SIBL.

Davis agreed to the following factual basis for his guilty plea: from at least 1999 through February 2009, Davis, along with Stanford and others, orchestrated a scheme whereby investors were duped into investing more than $5 billion into a CD program at SIBL, located in Antigua, which Davis and Stanford had advertised would be reinvested in safe and secure investments but which were in fact used to perpetrate a massive Ponzi scheme.

Further, as early as 1990, Davis as controller and then as CFO of SIBL, at Stanford's request, began making false entries into the books and records of SIBL, reflecting false earnings and assets that were shown on SIBL's annual reports filed with the Antigua bank regulators.

By the time the scheme collapsed in February 2009, the Stanford corporations had raised in excess of $7 billion from the sale of the fraudulent CDs.

Over 99% of Stanford's reported income was generated from the scheme.

Stanford companies were insolvent entities used by Stanford in a Ponzi scheme from at least 1999 because the corporations were funded and sustained primarily by proceeds from SIBL's sale of the fraudulent CDs.

SIBL's liabilities (from the sale of CDs) exceeded its actual assets, rendering the company insolvent and creating burgeoning deficits year-on-year since at least 1999.

False financial disclosures were manufactured and mailed to investors, and over $2 billion in loans to Stanford were not disclosed to them.

[R]eal estate owned by SIBL was listed as being worth billions of dollars when in fact it was worth no more than $100 million.

SIBL's assets consisted chiefly of "financial assets" whose fair market value was much smaller than reported and of Stanford's worthless promissory notes.[14]

---

[14] The operation by Stanford was a Ponzi scheme with no real cash flow other than new investors. *See Chadbourne & Parke LLP v. Troice, et al.*, 134 S.Ct. 1058; *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 712 F.3d 185, 194 (5th Cir. 2013); *S.E.C. v. Stanford Intern. Bank Ltd.*, 424 F.App'x 338 (5th Cir. 2011); *Janvey v. Alguire*, 628 F.3d 164, 168 (5th Cir. 2010); *Janvey v. Adams*, 588 F.3d 831; *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 567 (5th Cir. 2010); *Janvey v. Alguire*, 647 F.3d 585, 591 (5th Cir. 2011); *Janvey v. Democratic Senatorial Campaign Committee, Inc.*, 699 F.3d 848 (5th Cir. 2012); *Janvey v. Libyan Inv. Authority*, 478 F.App'x 233 (5th Cir. 2012); *S.E.C. v. Stanford Intern. Bank Ltd.*, 465 F.App'x 316 (5th Cir. 2012).

45.    Every court that has reviewed the Stanford Ponzi scheme has made a determination that SIB and SGC where one in the same entity and they committed the same Ponzi scheme—yet Pershing and the arbitration panel ignored this relationship and did not require Allen Stanford to answer these important AML questions because they did not want to offend Mr. Stanford and risk losing the transfer of $4 billion of assets from Bear Stearns.  *See S.E.C. v. Securities Investor Protection Corp.*, 2014 WL 3538066, *11 (C.A.D.C. 7/18/14) ("Their funds [the investors who purchased SIB CDs] thus became part of the Stanford entity's [SGC] 'capital' for purposes of the § 78lll(2)(C)(ii) exclusion."). All of the income of the Stanford-related companies came from SIB. *See Janvey v. Democratic Senatorial*, 793 F.Supp.2d at 856 ("The evidence further demonstrates that the Ponzi scheme was comprised of over 100 interrelated entities whose primary, if not exclusive, source of funding was derived from SIB CDs…"); *see also* Reply Brief for Appellant at 21, *S.E.C. v. Securities Investor Protection Corp.*, 2014 WL 3538066 (C.A.D.C. 2014) (No. 12-5286), 2013 WL 2285571, at *13, ECF No. 1438123 ("Regardless of the standard of proof applied, the Commission has shown that, under the unusual circumstances presented there, SGC accountholders who purchased SIBL CDs through SGC should be deemed to have deposited funds with SGC…").

46.    The Patriot Act itself does not give rise to a private right of action for Petitioners. However, the law is clear that the AML and FINRA rules provide the standard of conduct that a reasonable broker should follow in performing due diligence on an introducing broker like SGC to avoid liability under the state securities acts, breach of the duty of good faith and fair dealing under a customer agreement or tort claims for breach of the duty owed by a reasonable clearing broker. The same due diligence required under AML is required under their various legal theories.

**ROLE OF PERSHING**

47.     This is not a case of lower level people failing to perform administrative functions or failing to discover problems. This is a case of the highest level of Pershing's officers and managers knowing the right questions to ask, asking the questions to Stanford management but not Allen Stanford, and never demanding that Stanford answer the questions for a period of four years.   There is one central question that arose out of this arbitration proceeding that was uncontested and resulted in a manifest error of law. Why was Allen Stanford and his companies never required to comply with the Patriot Act and Pershing's own AML Guidelines from July 2005 to February 2009? The evidence on this issue is simple and direct—because top management did not want to offend Allen Stanford and run the risk of him not transferring the $4 billion of assets held at Bear Stearns. Pershing knew the Red Flags as shown by the uncontested evidence but did not require Allen Stanford and his lieutenants to answer the questions for three years. Pershing essentially sacrificed the interest of its customers for one reason—to take four billion dollars of business away from Bear Stearns and attempt to initiate other "partnerships" with Stanford.  What is unusual about this case is that (i) it involves the top management of Pershing; (ii) the facts are uncontested that Pershing knew of the "Red Flags" about Stanford; and (iii) everyone at Pershing admitted that it did nothing to require that the information be obtained that would have identified the Ponzi scheme between April 2005 and February 2009. The names of the Pershing employees and the role they played in not requiring answers from Allen Stanford are set forth in detail in the Memorandum in Support of the Complaint and Motion to Vacate which will initially be filed under seal.

48.     Pershing had to assert the FINRA Defense because it had no other argument—the facts are uncontested that the audits of SGC, the Introducing Broker, were in the possession of

Pershing in July 2005 and that key officers of Pershing knew in July 2005 that two-thirds of the gross income of SGC came from SIB, a "bank" located in Antigua, a tier one, high-risk money laundering country *before* Pershing executed a clearing agreement with SGC.  For four years between July 2005 and February 2009, Pershing never determined what assets were generating the foreign source income or the phantom rates of return.

49.    Pershing was unable to contest that it violated the Patriot Act and its own AML policy from April 2005 until February 2009 by willfully and intentionally failing to obtain answers to known "Red Flags," including the failure to determine (i.) the source of two-thirds of the income for SGC, the introducing broker, which everyone knew was from SIB, which was located in the high-risk country of Antigua; (ii.) the source of capital of SGC that was injected by Allen Stanford for a four-year time period to replenish the capital caused by monthly losses; (iii.) the underlying assets of SIB that produced the foreign source income that constituted two thirds of the income of SGC; and (iv.) the names of the  money managers investing the SIB assets which would have established that no real assets existed at SIB.

50.    The proper performance of the required due diligence in 2005 and 2006 could have prevented one of the largest Ponzi schemes in American History.  Even though the uncontested evidence showed Pershing's top management had knowledge of these Red Flags, Pershing's highest management did not require Allen Stanford to answer these specific questions mandated by the Patriot Act from July 2005 until February 2009 because of Pershing's desire to profit from the Stanford relationship and obtain a transfer of $4 billion of assets from Bear Stearns in December 2006.

## COUNT ONE
## (BIAS)

51.   The arbitrators were biased because of FINRA's relationship to this proceeding and the fact that Pershing made the failure of FINRA to properly perform its regulatory and supervisory function to SGC, a United States broker dealer, its primary defense in the case ("FINRA Defense"), arguing that because FINRA did not discover the Stanford Ponzi scheme. By Pershing arguing that it had no obligation to perform any higher standard of conduct than FINRA. FINRA's level of performance became the legal standard of conduct followed by the panel and not the standard of conduct required by *Chadbourne*, the state securities law, and the Patriot Act.

52.   For the Panel to determine that Pershing was liable, the Panel would have had to also determine FINRA did not perform its regulatory function in reviewing the operations of SGC. This arbitration was the first of many that may expose Pershing to losses totaling $7 billion associated with the Stanford Ponzi scheme and had significant and substantial ramifications to FINRA and the clearing broker industry if it resulted in an adverse judgment. The FINRA Defense, injected by Pershing, created a conflict that resulted in inherent unfairness to Petitioners.

53.   Pershing voluntarily injected FINRA's conduct into the trial in its opening statement, and its misconduct and the misconduct of the SEC became its primary defense. Pershing essentially argued, despite the clear rule of law established in the United States Supreme Court case of *United States v. Gaubert*, 499 U.S. 315, 326 (1991), that it should have no liability because FINRA and the SEC had a greater responsibility than it did, and because it did not discover the problem, Pershing cannot be held accountable for violating its duties to Petitioners. This argument was designed to circumvent specific duties established by *Chadbourne* and the Patriot Act.

54.   Pershing's decision, in its sole discretion, to inject the FINRA Defense into the proceeding and establish FINRA's level of performance as the proper standard of care for its

liability in order to circumvent the duties it owed Petitioners as a matter of law, created institutional bias and a conflict of interest for the Panel. The arbitrator's relationship with FINRA, consisting of training, appointment to various arbitration panels, and payment of professional fees, squared off against FINRA's role in not timely discovering the Ponzi scheme.

55.     While this defense ignores the obligation that Pershing had to comply with the Patriot Act and AML, it also created an irresolvable conflict, bias and prejudice between the Petitioners and FINRA so that Petitioners did not receive a fair hearing. By tying its own duty and conduct to the actions of FINRA, Pershing put FINRA's actions on trial, the same entity that regulated the arbitrators, their qualifications, the hearing and their future appointments. As a matter of law, the level of performance of FINRA is not the standard of conduct and performance that is required of Pershing.

## COUNT TWO
### (Manifest Disregard of the Law)

56.     The Panel's partiality and bias caused by its zeal to protect FINRA resulted in the manifest disregard of the law by the Panel ignoring the duties imposed on Pershing by the *Chadbourne* decision of the United States Supreme Court, the specific terms of the Patriot Act, and Pershing's own AML Policy, the duty of good faith and fair dealing, and the state securities law.

57.     Pershing argued at the hearing that it was not required to perform any due diligence on an introducing broker such as SGC, even though two thirds of SGC's gross income came from SIB, located in Antigua, a country evaluated by Pershing and its parent, the Bank of New York, as a high-risk money laundering country.

58.     Pershing was unable to contest that it violated the Patriot Act and its own AML policy from April 2005 until February 2009 by willfully and intentionally failing to obtain answers

to known "Red Flags," including the failure to determine (i.) the source of two-thirds of the income for SGC, the introducing broker, which everyone knew was from SIB, which was located in the high-risk country of Antigua; (ii.) the source of capital of SGC that was injected by Allen Stanford for a four-year time period to replenish the capital caused by monthly losses; (iii.) the underlying assets of SIB that produced the foreign source income that constituted two-thirds of the income of SGC; and (iv.) the names of the money managers investing the SIB assets which would have established that no real assets existed at SIB.

59.     A party seeking to vacate an arbitration award on the basis of manifest disregard of the law must satisfy a two-pronged test, proving that: "the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the dispute case, and nonetheless willfully flouted the governing law by refusing to apply it." *Stolt–Nielsen SA v. AnimalFeeds Int'l Corp.,* 548 F.3d 85, 95 (2d Cir. 2008).

60.     Pershing essentially argued, which argument was implicitly adopted by the Panel's Award, despite the clear rule of law established by the United States Supreme Court in the *Gaubert* case, that it should have no liability because the Securities and Exchange Commission and FINRA had a greater responsibility than it did, and because it did not discover the problem, Pershing cannot be held accountable for violating its duties to Petitioners. This argument was designed to circumvent specific duties established by *Chadbourne* and the Patriot Act.

61.     Section 10 of the Federal Arbitration Act empowers the court to vacate an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).

62.     The bias and partiality of the Panel resulted in manifest error by the Panel by its ignoring the duty that a broker has to its customer to refrain from conduct that benefits the broker to the detriment of the customer regardless of what information the broker has.  The law was ignored because of the institutional bias created by the FINRA Defense of Pershing that was asserted against Petitioners that a finding against Pershing would in fact be a finding against FINRA for its failure to supervise SGC and discover the Stanford Ponzi scheme.

63.     The Panel manifestly disregarded the law when it ignored the uncontested facts that Pershing violated both the Patriot Act as well as its own AML policies.

64.     The Arbitration Award should be vacated based upon the Panel's manifest disregard of the law. The Panel's Award was rendered in manifest disregard of the law, based upon the uncontroverted facts that Pershing violated the Patriot Act, its own internal policies on the proper AML due diligence on an introducing broker, and the Louisiana securities law.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners, **DR. THOMAS J. KIEBACH,** *et al.*, pray for judgment as follows:

A.     Vacating the Arbitration Panel's November 3, 2014 Award against Petitioners;

B.     Awarding Petitioners the attorneys' fees and costs incurred in this proceeding as well as the Arbitration Proceeding; and

C.     Granting such other and further relief the Court may deem proper.

Dated: December 11, 2014

Respectfully submitted:

**PREIS GORDON, APLC**

Phillip W. Preis, La. Bar Roll No. 10706
Charles M. Gordon, Jr., La. Bar Roll No. 23758
2150 Bank One Centre - North Tower
450 Laurel Street (70801-1817)
Post Office Box 2786 (70821-2786)
Baton Rouge, LA
Telephone: (225) 387-0707
Facsimile: (225) 344-0510
**ATTORNEYS FOR PLAINTIFFS,
DR. THOMAS KIEBACH, *ET AL.***

DR. THOMAS J. KIEBACH,      \*     FINRA Arb. No. _____
*ET AL.*                        \*
                                  \*
**VERSUS**                     \*
                                  \*
**PERSHING, LLC**          \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CLAIMANTS' ORIGINAL STATEMENT OF CLAIM

Claimants (the persons listed on **Exhibit A** are collectively referred to herein as "Claimants") hereby file this claim on their own behalf and on behalf of their Individual Retirement Accounts ("IRAs") or trust accounts, and respectfully represent as follows:

### PARTIES

1.      Claimants in this case, appearing individually and on behalf of their individual retirement accounts or trusts, are as listed on **Exhibit A**.

2.      The Claimants had accounts with Pershing, LLC through Stanford Group Company ("SGC"). These Claimants held Stanford International Bank Certificate(s) of Deposit ("SIB CD(s)") in their individual names or were the beneficiaries of IRAs to which Pershing, LLC served as custodian.

3.      Made Respondent herein is **PERSHING, LLC** ("Pershing" or "Respondent"); a Delaware limited liability company and a registered Financial Industry Regulatory Authority ("FINRA") member broker/dealer authorized to conduct business in the State of Louisiana. Pershing can be served through its registered agent in Louisiana, Corporation Service Company, at 320 Somerulos Street, Baton Rouge, Louisiana, 70802. Pershing is one of the largest providers of global clearing services for other firms and institutions. Pershing served as the clearing broker for SGC from 2005 until December of 2008.

Page **1** of 41



**JURISDICTION AND VENUE**

4.      This tribunal has jurisdiction over this claim pursuant to Claimants' demand made under Section 12200 of the FINRA Code of Arbitration Procedure for Customer Disputes (the "FINRA Code").  Jurisdiction over Pershing is supported through the foregoing and Pershing's FINRA membership. Claimants are "customers," as that term is used in the FINRA Rules, who purchased services from a FINRA member in the course of the member's securities business activities that are regulated by FINRA.

5.      The Stanford Trust Company was a Louisiana trust company and was located in Baton Rouge, Louisiana.  Most Claimants reside in Baton Rouge, Louisiana, one of the epicenters of the Stanford Ponzi Scheme.

6.      Due to the majority of Claimants being over the age of sixty-five, Claimants respectfully request expeditious treatment be applied to this instant arbitration as an accommodation to the Claimants.

**DEFINITIONS AND NAMES**

7.      The following names and abbreviations are used in this Statement of Claim:

A.      "Investment Advisors" means the employees, officers, and/or directors of the Stanford Entities who sold the SIB CDs to Claimaints.

B.      "Offering Memoranda" means all of the documents and materials used by the Stanford Entities to induce Claimants to purchase SIB CDs.

C.      "Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act, Pub. L. 107-56, 115 Stat. 272 (codified as amended in scattered sections of 8 U.S.C., 12 U.S.C., 15 U.S.C., 18 U.S.C., 20 U.S.C., 31 U.S.C., 42 U.S.C., 47 U.S.C., 49 U.S.C., and 50 U.S.C.).

Page **2** of **41**

D.       "Period of Dispute" means January 1, 2005 to the date of the filing of this Statement of Claim.

E.       "Pershing" means Pershing, LLC, who contracted with the Stanford Group Company and Claimants as its clearing broker.

F.       "Ponzi Scheme" means the investment scheme perpetrated by Allen Stanford, SGC, SIB, Trust and SGH as described in Par. 27 in which these persons and entities (i) operated at a loss from 1999 until February of 2009, yet gave the appearance of being profitable by obtaining new investors; (ii) used those new investments to pay for the high premiums promised to earlier investors; and (iii) the effect of such a scheme is to put the company farther and farther into debt by incurring more and more liability while giving the Stanford Entities the false appearance of profitability in order to obtain new investors. *Janvey v. Alguire*, 628 F.3d 164, 176 (5th Cir. 2010).

G.       "Receivership" means the proceeding initiated by the SEC on February 17, 2009, entitled *SEC v. Stanford International Bank, Ltd., et al.*, Docket No. 3:09-cv-00298, United States District Court, Northern District of Texas, wherein Ralph Janvey was appointed as Receiver on the same date.

H.       "SIB CDs" means the debt instruments sold to Claimants by Trust and SGC and issued by Stanford International Bank, Ltd.

I.       "Stanford Entities" mean SGC, SGH, Trust, and SIB or any other entities or companies owned by the aforementioned.

J.       "Stanford Group Company" or "SGC" is a Houston-based corporation, which is registered with the Commission as a broker-dealer and investment advisor.  It has 29 offices located throughout the U.S., including Baton Rouge, Louisiana.  SGC's principal business

Page **3** of **41**

consists of sales of SIB-issued securities, marketed as certificates of deposit. SGC is a wholly owned subsidiary of Stanford Group Holdings, Inc., which in turn is owned by Allen Stanford ("Stanford"). Trust are employees of and affiliated with SGC.

K.      "Stanford Group Holdings" ("SGH") is the parent company of SGC, and is wholly owned and controlled by Allen Stanford. SGC and SGH are currently in Receivership.

L.      "Stanford International Bank, Ltd." or "SIB" is a private international bank domiciled in St. John's Antigua, West Indies.  SIB sold the SIB CDs to U.S. investors through SGC, its affiliated investment advisor.

M.      "Trust" or "STC" means the Stanford Trust Company, which is an affiliate of SGC. STC was located in Baton Rouge, Louisiana and was organized under the laws of Louisiana, and examined by and chartered with the Office of Financial Institutions, State of Louisiana ("OFI"). The Trust was owned by SGH.

## SUMMARY OF ALLEGATIONS

8.      SGC and Trust solicited funds from Claimants to purchase the SIB CDs, which were issued by SIB, a foreign offshore bank located in Antigua.

9.      In 2005, Daniel Bogar, SGC President, and Eddie Rollins, contacted Pershing to negotiate an agreement in which Pershing would serve as the clearing broker for SGC.

10.      At the time that SGC contacted Pershing,  Pershing was one of the largest and most sophisticated clearing brokers in the industry and had substantial experience with the duties to comply with the  applicable securities laws and anti-money laundering laws and regulations of FINRA and the United States Treasury Department, including Sections 312 and 352 of the Patriot Act.

Page **4** of **41**

11.     The negotiation and execution of a clearing agreement between Pershing and SGC occurred throughout 2005, and culminated on December 27, 2005 with the parties agreeing to a five-year clearing relationship (the "Clearing Agreement").

12.     At the commencement of the consideration of the terms of the relationship contemplated by the Clearing Agreement, Pershing immediately realized that SIB was the real party in interest, that the agreement being negotiated focused on facilitating the sale of the SIB CDs and transfer of funds through Pershing to facilitate the purchase of the SIB CDs, and that SIB was the primary entity that generated all of the income for the Stanford Entities. Prior to finalizing the Clearing Agreement, Pershing attempted to perform due diligence on the operations of SGC and SIB as required by the FINRA rules and the rules of the Securities and Exchange Commission and the U.S. Treasury Department because SIB was a foreign offshore bank located outside of the United States. Based upon this due diligence, Pershing determined that the SIB CDs were being sold to United States citizens who were allegedly accredited investors. Further, Pershing determined that the SIB CDs were not registered in accordance with the Securities Act of 1933, or the securities laws of Texas or Louisiana, or any other state in which SGC was operating.  Finally, Pershing determined that the assets that allegedly supported the underlying value of the SIB CDs were not being disclosed to the purchasers of the SIB CDs because this same information was requested by Pershing but was not available for review.

13.     Despite the high-risk profile of SIB because of its location in Antigua and numerous requests by Pershing for information relating to the underlying assets and the sources of income and cash flow of SIB, SIB's financial information could not be verified by Pershing prior to Pershing commencing as the clearing broker for the SIB CDs. Despite the fact that this information was not disclosed to Pershing,  Pershing agreed to serve as the clearing agent for

SGC and to facilitate the purchase of the SIB CDs as alleged herein because of the substantial fees that Pershing would realize as clearing broker and Pershing's desire to enter the securities markets in Central America and South America in the future.

14.     Had Pershing completed the due diligence required by the anti-money laundering laws (including the FINRA rules, the Patriot Act and the applicable securities laws) before executing the clearing broker agreement with SGC, it would have learned of the existence of the Ponzi Scheme and would have readily determined that the SIB CDs had little or no value and that the only cash flow of SIB was not from operations but from the sale of SIB CDs.

15.     Pershing played a vital and substantial role in supporting the Ponzi Scheme between December 27, 2005 and February 17, 2009.  First, Pershing was the vehicle by which the Claimants' securities and funds that were held by other investment firms were captured and placed under the domain and control of Allen Stanford.  Secondly, Pershing was the platform that allowed Stanford to convert the Claimants' funds (whether in individual, IRA accounts, or trusts) into cash by wiring the funds through various financial intermediaries to SIB.

16.     At all times, Pershing knew that its real relationship was with SIB because of the need of all of the Stanford Entities for SIB to generate the substantial fees from the sale of the SIB CDs. It was readily apparent to Pershing that if SIB was not happy with the Pershing relationship, Pershing would not be able to complete an agreement with SGC.  Further, Pershing knew that the SIB CDs were not registered securities, that the SIB CDs were being sold to unsophisticated retirees who were not accredited investors, and that the SIB CD Offering Memoranda being used did not adequately explain the operation of SIB. Without Pershing serving as the clearing agent to convert Claimants' prior investments to cash, the Ponzi Scheme

would not have been successful. Pershing was paid tremendous fees for performing essential services for the Ponzi Scheme.

## ALLEGATIONS

### Stanford Entities

17.    Stanford Trust Company is owned by the Stanford Group Company and Stanford Group Holdings, Inc.   These entities were owned by Allen Stanford.   The issuer of the certificates of deposit was Stanford International Bank.  SIB was also owned by Allen Stanford.

18.    Stanford Group Company was a Houston-based broker-dealer and investment advisor company since October 1995. SGC was a wholly-owned subsidiary of Stanford Group Holdings, Inc., which was owned and controlled by Allen Stanford.

19.    The SIB CDs were sold by SIB through the affiliated broker dealer, SGC, with the sales and proceeds then being the primary source of income of all of the Stanford Entities.

20.    The Trust was formed in 1998 for the primary purpose of serving as a custodian on individual retirement accounts.  The sole purpose of the Trust serving as the custodian of the IRAs was to give Allen Stanford a vehicle to capture funds from persons such as the Claimants, whose retirement account rollovers were used to invest in SIB CDs.

21.    SIB sold SIB CDs to the IRAs, of which the Trust was custodian. The Trust was located in Baton Rouge, Louisiana.  The Trust served as custodian for all IRAs in the United States that purchased SIB CDs.

22.    Baton Rouge, Louisiana, was the epicenter of the losses to Stanford Trust IRAs caused by Stanford's Ponzi Scheme because the trust was located in Louisiana, and was a Louisiana trust company regulated by OFI.

23.    When the Trust served as custodian of an IRA, the only security that was purchased for each IRA was the SIB CD. All of the Claimants rolled their retirement plans' funds into IRAs and designated the Trust as custodian.

24.    As a part of the Ponzi Scheme, the entirety of the Claimant's IRA would be transferred or rolled over to Pershing. The cash portion of the IRA rollovers would be deposited at Pershing and Pershing would serve as the custodian of the cash and securities portion of the IRA rollover. Pershing would then wire to the Trust the funds used to purchase SIB CDs held by IRA's, where the Trust served as the custodian of the portion of the IRA assets that would be used to purchase the SIB CDs. This same pattern of conduct of investing approximately half of the IRA rollover funds with Pershing as custodian for the liquid securities and the Trust as custodian of the account, which held the SIB CDs, was continuously repeated.  However, in almost all instances, the entirety of the original rollover would be cleared by Pershing.

25.    The Claimants are mostly retirees of Exxon and IRA account holders that invested all of their retirement life savings with SGC and STC in SIB CDs.  In addition, many of the Claimants invested their personal funds in SIB CD thru accounts that were administered by Pershing.

26.    In truth and in fact, the sale of the SIB CDs from December of 2005 until February of 2009 turned out to be the largest Ponzi Scheme in American history next to the Bernard Madoff Ponzi Scheme. Unlike Madoff, little or no recovery has been made by the receiver, Ralph Janvey, of any assets because of the complete absence of any actual investments by SIB. A minimal level of due diligence of the underlying assets by Pershing would have revealed the Ponzi Scheme and SIB's worthless or non-existent assets.  Pershing totally ignored the warning signs.

Page **8** of **41**

**The Ponzi Scheme**

27.     The Ponzi Scheme existed from 1999, as determined by the Fifth Circuit Court of

Appeals in *Janvey v. Democratic Senatorial Campaign Committee, Inc.*  712 F.3d 185, 198-

199 (5th Cir. 2013), where the court stated the following:

> [T]he guilty plea and rearraignment statements of James M. Davis ("Davis"),
> Stanford's Chief Financial Officer, determined that the Stanford Ponzi scheme
> began and was insolvent as early as 1999 and that it was continuously operated in
> this manner and condition until it began to unravel in October 2008.

> Stanford and Davis were prosecuted for and convicted of numerous federal
> offenses in their operation of the Ponzi scheme and are currently serving federal
> prison sentences.

> On August 27, 2009, Davis was rearraigned and pleaded guilty to a number of
> offenses, the basic elements of which were that he knowingly defrauded investors
> who purchased CDs from SIBL and that he also conspired to obstruct an SEC
> investigation into SIBL.

> Davis agreed to the following factual basis for his guilty plea: from at least 1999
> through February 2009, Davis, along with Stanford and others, orchestrated a
> scheme whereby investors were duped into investing more than $5 billion into a
> CD program at SIBL, located in Antigua, which Davis and Stanford had
> advertised would be reinvested in safe and secure investments but which were in
> fact used to perpetrate a massive Ponzi scheme.

> Further, as early as 1990, Davis as controller and then as CFO of SIBL, at
> Stanford's request, began making false entries into the books and records of SIBL,
> reflecting false earnings and assets that were shown on SIBL's annual reports filed
> with the Antigua bank regulators.

> By the time the scheme collapsed in February 2009, the Stanford corporations had
> raised in excess of $7 billion from the sale of the fraudulent CDs.

> Over 99% of Stanford's reported income was generated from the scheme.

> Stanford companies were insolvent entities used by Stanford in a Ponzi scheme
> from at least 1999 because the corporations were funded and sustained primarily
> by proceeds from SIBL's sale of the fraudulent CDs.

> SIBL's liabilities (from the sale of CDs) exceeded its actual assets, rendering the
> company insolvent and creating burgeoning deficits year-on-year since at least
> 1999.

> False financial disclosures were manufactured and mailed to investors, and over
> $2 billion in loans to Stanford were not disclosed to them.

> [R]eal estate owned by SIBL was listed as being worth billions of dollars when in
> fact it was worth no more than $100 million.

> SIBL's assets consisted chiefly of "financial assets" whose fair market value was
> much smaller than reported and of Stanford's worthless promissory notes.

28.     On February 17, 2009, the SEC brought suit against Stanford Group Company,

along with various other Stanford corporate entities, including SIB, for allegedly perpetrating a

massive Ponzi Scheme.

29.     After suit was brought by the SEC, the district court appointed Ralph S. Janvey as

the Receiver of the Stanford companies to marshal, conserve, hold, manage and preserve the

value of the receivership estate.[1]

30.     James Davis, and Laura Pendergest-Holt, the top management echelon for the

Stanford Entities, pleaded guilty to criminal charges filed by the United States for providing false

information to investors like Claimants as to SIB's investment strategy, earnings, and safety, and

for artificially pegging the value of the SIB CDs to the amount of asset earnings necessary to

give SIB an acceptable financial performance and capital ratios, all in an effort to induce the

purchase of the SIB CDs.

31.     On March 6, 2012, a jury in Houston, Texas convicted Allen Stanford of four

counts of wire fraud, one count of conspiracy to commit wire and mail fraud, five counts of mail

fraud, one count of conspiracy to obstruct an SEC proceeding, one count of obstruction of an

---

[1] The legal issues arising from the receivership have been the subject of multiple appeals to the Fifth
Circuit Court of Appeals. The underlying facts of the Stanford Ponzi scheme are set out in *S.E.C. v.
Stanford Intern. Bank Ltd.*, 2011 WL 1758763, 1 (5th Cir. 2011); *Janvey v. Alguire*, 628 F.3d 164, 168
(5th Cir. 2010); *Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009); *Pendergest-Holt v. Certain Underwriters
at Lloyd's of London*, 600 F.3d 562, 567 (5th Cir. 2010); and *Janvey v. Alguire*, 647 F.3d 585, 591 (5th
Cir. 2011).

SEC proceeding, and one count of conspiracy to commit money laundering, all related to his Ponzi Scheme.

32.     At the SEC hearing held from February 11, 2013 through March 1, 2013, entitled *In the Matter of Daniel Bogar, Bernerd E. Young, and Jason T. Green* in Houston, Texas, representatives of Pershing testified as to the scope of their due diligence and admitted the fact that Pershing agreed to serve as the clearing broker of SGC despite the complete lack of transparency on the value of SIB's underlying assets or the source of income and cash flow of SIB.

**Role of Pershing**

33.     In 2005, Daniel Bogar, SGC President, and Eddie Rollins, head of SGC's private client business, initiated a plan to replace Bear Stearns as SGC's clearinghouse with Pershing. At the time of this meeting, the Ponzi Scheme described in Par. 27 was in "full swing," and millions of dollars of SIB CDs were being sold to non-accredited investors by the Stanford Entities.

34.     Pershing was one of the largest and most sophisticated companies in the financial industry.  Pershing is a leading global clearinghouse of securities.  During 2005, SGC negotiated with Pershing to provide investment processing, fund processing, and clearinghouse solutions to SGC by wiring funds in multiple types of investment accounts to SIB, and serving as custodian for the SGC brokerage accounts.

35.     Preliminary negotiations between Pershing and SGC involved senior-levels of Pershing's management, including John Ward, Pershing Relationship Manager for SGC, Rich Brueckner, CEO of Pershing, and the CEO of Pershing's parent, Bank of New York.

36.     In 2005, prior to becoming Stanford's brokerage and clearinghouse, Pershing conducted a due diligence inquiry into SGC and SIB.  One of the primary issues encountered early in the negotiation process was the lack of transparency of the assets supporting the SIB portfolio, the lack of transparency of SIB's source of income, and the extent that SIB's cash flows were attributable to any activity other than the sale of SIB CDs.  Further, Pershing was aware that the audit on this billion dollar company was being conducted by a  "one man band" that was known as CAS Hewlett, a local Antiguan accounting firm.

37.     Pershing knew SIB was the source of substantially all of the net cash flow of the Stanford Entities, and the maximization of the sale of the SIB CDs was a key component of this business model.  Further, Pershing knew SIB was a "high risk" operation that mandated a full due diligence review by its staff.  After completing the due diligence review, Pershing was aware that there was no transparency of SIB's claimed multi-billion dollar investment portfolio of assets or the source of the income and cash flow of SIB.  Despite the fact that Pershing did not find the answers to the questions that its due diligence guidelines required, it nonetheless entered into a Clearing Agreement with SGC, agreeing to perform wire transfer and clearinghouse duties for the SIB CDs.

38.     As a part of the function of Pershing, Pershing was compensated to wire funds for the investments of the Trust and each of the Claimants in the SIB CDs.  As such, Pershing agreed to perform the following:

a.      Wire transfer money from SGC clients' accounts at SGC (in custody at Pershing) to SIB for the purchase of the SIB CDs; or

b.      Wire transfer funds from the SGC clients' accounts to STC for the purchase of SIB CDs to be held in the clients' IRAs at STC.

39.     Pershing, in particular, put its internationally known and respected brand name behind SGC and SIB, thereby lending recognition and credibility to the Stanford Entities and supporting their sales efforts.  Pershing provided SIB and SGC brochures to be included in each sales packet to provide to each investor touting the profile and financial success of Pershing.

40.     Because SIB did not disclose the details of the financial operations of SIB to Pershing, Pershing was unable to:

a.      Determine the fair value of the assets that supported the SIB CDs;

b.      Confirm the source of funds that were being used to fund the SIB operations and whether it was potentially involved in money laundering operations;

c.      Determine the source of any income that should be realized or recognized by SIB and whether SIB was in fact operating either as a money laundering operation or a Ponzi Scheme;

d.      Determine that the sale of SIB CDs was the only real source of income to the Stanford Entities;

e.      Determine that the entire Stanford operation was a Ponzi Scheme from inception;

f.      Determine that the Offering Memoranda given to Claimants and other Stanford victims were materially false and misleading, because even someone with the "clout" of Pershing, could not obtain the information relating to what assets supported the value of the SIB CDs; or

g.      Evaluate the management of the Stanford Entities, including SIB, because it would be impossible to know the caliber of the management without being able to evaluate their financial results.

41.     Despite its knowledge of this lack of transparency of SIB's financial operations and the other warning signs, Pershing acted in its own self-interest and in violation of its fiduciary duties to Claimants' by agreeing to serve as the clearing broker and in fact facilitating the massive Ponzi Scheme from December of 2005 until the receivership was implemented in February of 2009.

**Anti-Money Laundering Laws**

42.     The Patriot Act and the rules of FINRA require that U.S. financial institutions such as Pershing apply due diligence on foreign institutions such as SIB. Because SIB operated under an offshore banking license, Pershing was required to enact enhanced due diligence requirements. As such, Pershing had a duty to establish, at a minimum, a due diligence program that included appropriate, specific, risk-based policies, procedures, and controls reasonably designed to detect and report known or suspected money laundering activities.

43.     Congress passed the USA Patriot Act in 2001 ("Patriot Act"). One of the most important provisions of the Patriot Act is Section 312, which amended the Bank Secrecy Act[3] to add new subsection (i) to 31 U.S.C. § 5318. This provision placed a special duty on certain financial service companies to perform due diligence on services rendered to persons and entities located outside of the United States.

44.     Section 312 of the Patriot Act requires financial institutions that establish, maintain, administer, or manage correspondent accounts in the United States for non-U.S. persons to adopt anti-money laundering due diligence measures with respect to those accounts. In particular, a covered financial institution such as Pershing must establish appropriate, specific and, where necessary, enhanced due diligence policies procedures and controls that are

---

[3] Bank Secrecy Act, Pub. L. No. 91-508 (codified as amended at 12 U.S.C. 1829b, 12 U.S.C. 1951-1959, and 31 U.S.C. 5311-5314 and 5316-5332).

reasonably designed to enable the financial institution to detect and report instances of money laundering through these accounts. These enhanced due diligence measures are in addition to the minimal due diligence that Pershing was required to perform with respect to clearing transactions for any foreign bank.

45.     In response to the Patriot Act, FINRA adopted specific guidelines for broker dealers that would implement the special duties of due diligence on member Firms.

46.     Rule 3310 of FINRA provides the following:

**Anti-Money Laundering Compliance Program**

**<u>Each member shall develop and implement a written anti-money laundering</u> <u>program reasonably designed to achieve and monitor the member's</u> <u>compliance with the requirements of the Bank Secrecy Act</u>** (31 U.S.C. 5311, *et seq.*), and the implementing regulations promulgated thereunder by the Department of the Treasury. Each member's anti-money laundering program must be approved, in writing, by a member of senior management.

(Emphasis added).

47.     FINRA requires members such as Pershing to certify their compliance with the requirements of the Patriot Act, and the implementing regulations promulgated thereunder by the Department of the Treasury.

48.     Section 352 of the Patriot Act requires all financial institutions to develop anti-money laundering programs by April 24, 2002, even if the financial institutions are not covered by the Bank Secrecy Act regulations. *See* 21 U.S.C. § 5318(h). At a minimum, such programs must include:

A.     the development of internal policies, procedures, and controls;

B.     the designation of a compliance officer;

C.     an ongoing employee training program; and

D.     an independent audit function to test programs.

49.     On December 14, 2005, the Financial Crimes Enforcement Network (FinCEN) issued a release stating that a Section 352 compliant anti-money laundering program should include procedures for conducting due diligence on foreign correspondents. *See generally* Interpretive Release 2004-1—Anti-Money Laundering Program Requirements for Money Services Business With Respect to Foreign Agents or Foreign Counterparties, 69 Fed. Reg. 74439, 74441 (Dec. 14, 2004). In particular, the release stated:

> Money Services Businesses should establish procedures for conducting reasonable, risk-based due diligence on potential and existing foreign agents and counterparties to help ensure that such foreign agents and counterparties are not themselves complicit in illegal activity involving the Money Services Business' products and services, and that they have in place appropriate anti-money laundering controls to guard against the abuse of the Money Services Business' products and services. Such due diligence must, at a minimum, include reasonable procedures to identify the owners of the Money Services Business' foreign agents and counterparties, as well as to evaluate, on an ongoing basis, the operations of those foreign agents and counterparties and their implementation of policies, procedures, and controls reasonably designed to help assure that the Money Services Business' products and services are not subject to abuse by the foreign agent's or counterparty's customers, employees, or contractors. The extent of the due diligence required will depend on a variety of factors specific to each agent or counterparty. We expect Money Services Businesses to assess such risks and perform due diligence in a manner consistent with that risk, in light of the availability of information.

(Internal footnote omitted).

50.     In electing to waive its due diligence requirements in ascertaining the assets and the source of the income and net cash flow of SIB, Pershing failed to establish and implement policies, procedures, and internal controls reasonably designed to achieve compliance with the anti-money laundering laws and regulations thereunder including the FINRA Rules and the Patriot Act.

51.     Upon information and belief, a substantial amount of the transfers of customer cash to purchase the SIB CDs was made to Canadian banks and not to Antigua upon the request

of SIB and SGC.  Had the transfers been made by Pershing directly to Antigua, based upon information and belief, additional reporting requirements would have existed under the Patriot Act.  Pershing knew at all times that the funds were being indirectly transferred to SIB in Antigua.  This activity of hiding the true beneficiary of the transfer by making bank transfers to Canada, and not reporting these transfers, may be a violation of law, when Pershing knew that the intended beneficiary of the fund was a foreign bank located in Antigua.  In such event, Pershing would be obligated to pay triple damages under Louisiana law.

**Failure to Perform Due Diligence**

52.  Claimants have suffered substantial financial injury as a result of Pershing's conduct, as alleged herein.  Because a substantial number of all of the Claimants are older adults, who are no longer gainfully employed, their prospects of replacing the retirement monies lost are virtually nonexistent, leaving Claimants with substantially reduced means for their continued sustenance.

53.  Pershing indirectly received commission income for the services it provided in its role in supporting the Ponzi Scheme.  Fees from the commissions paid by SIB to SGC were used to pay Pershing for the significant transfer and wiring fees to purchase the SIB CDs.  Thus, Pershing played an integral role in effecting the SIB CD Ponzi Scheme.

54.  Despite the integral role Pershing played in converting Claimants' assets into cash so the funds could be sent out of the country to the Antiguan bank, Pershing either failed to inquire, or negligently ignored material facts and risks of the SIB CDs.  Pershing should have known and understood, as fiduciaries representing Claimants, the underlying assets supporting the values of the SIB CDs.  Further, Pershing continued to perform the integral role of wiring

and "cash conversion" services despite the fact that it and the investors did not know of the value of the SIB CDs or the assets supporting their underlying value.

55.    Pershing failed to follow FINRA standards of due diligence as the clearing broker and custodian of Claimants' funds, in evaluating the Claimants' risks in the purchase of the SIB CDs.   Pershing's failure to follow these due diligence standards was a proximate cause of Claimants' losses from Stanford's Ponzi Scheme.   Further, SGC, STC, and Pershing failed to properly report the value of the SIB CDs.   Had Pershing properly performed its due diligence and voiced its concerns about the lack of transparency of the SIB portfolio, the Ponzi Scheme of Allen Stanford would have been apparent and the Claimants would not have rolled their IRAs and individual funds into the SIB CDs via the Pershing conduit.

56.    Pershing had little or no regard for the interest of its customers and elected to enter into the profitable relationship with Stanford and to receive payments from the illicit Ponzi Scheme despite the lack of transparency in the assets of SIB and the lack of transparency in the sources of income and cash flow of SIB and SGC.   The failure to disclose the risks as perceived by Pershing to each Claimant who purchased SIB CDs or renewed SIB CDs during this time period resulted in significant loss to Claimants.

57.    Because of this lack of disclosure of material information and the risks associated with the SIB CDs by Pershing, Claimants simply did not know the risks inherent in an investment in the SIB CDs.   In truth and in fact, SIB was a Ponzi Scheme, which used cash flow realized from the proceeds of the sale of other SIB CDs to new investors to pay the interest income on the older SIB CDs rather than the actual cash income generated from the investments of SIB. Pershing provided a platform for the Stanford Entities to effectuate their Ponzi Scheme

from December 27, 2005 through the end of 2008 without informing the investors of the lack of transparency of the SIB portfolio.

58.     Many of the investors lost their entire life savings.  These funds were amassed by sacrificing and cautiously saving throughout the course of their working lives.  The losses at issue are not the simple result of the failure of legitimate investments to perform as expected; rather, these are losses which could have been avoided had Pershing not breached its fiduciary, statutory, and contractual duties owed to Claimants.  Pershing turned a "blind eye" to the Stanford Ponzi Scheme, as alleged herein, and its inaction provided fertile ground for the scheme to grow and succeed, which devastated the Claimants and their families.

59.     Pershing was aware that there was no transparency of SIB's multi-billion dollar investment portfolio of assets from December 27, 2005 until December of 2008 while it served as the clearing broker for SGC.  Despite its knowledge of this lack of transparency, Pershing acted in its own self-interest and in violation of its fiduciary duties to Claimants' by doing nothing because of its desire to continue to receive the substantial fees as clearing broker as well as attempting to exploit the opportunity to be a competitive force in the South and Central American market place.

60.     In agreeing to perform the wire transfer and clearinghouse duties for SGC, Pershing assumed a duty to disclose all of the information it knew about SGC and SIB and not to make partial disclosures that might, and did, convey a false impression about SIB.  Moreover, Pershing was clearly on notice that the investing public in Louisiana, Texas, and other states, many of which were unaccredited investors, were being actively solicited to roll over the proceeds of their retirement accounts into SIB CDs, were being offered products substantiated by little or no financial information, and the funds were essentially being invested in the "black hole

of Calcutta." Despite all of this information, Pershing made no attempt to determine whether the offering was a public offering or whether the offering to the retirees met the proper disclosure requirements.

61.     By agreeing to assist SGC, the Trust, and SIB through its brokerage and clearinghouse functions, Pershing actively assisted the SGC and Trust sales force in the implementation of the Ponzi Scheme and therefore knew or should have known that they were acting as links in the chain of selling unregistered securities to Claimants from, by, and through Louisiana, Texas, and other states. But for Pershing's participation, SGC, Stanford Trust, and SIB could not have sold unregistered securities to Claimants from, by, and through Louisiana and Texas.

62.     Pershing had knowledge of the Stanford Entities and SGC's reliance upon the referral fees generated from SIB, and that the fact that future financial survival of the Stanford Entities was contingent on the ability of SIB to continue generating income in order to pay SGC referral fees.

63.     Claimants relied upon the supposed conservative and sophisticated reputation of Pershing and that Pershing had performed the required due diligence on the operations of SIB, and the representations made by SIB to SGC and Pershing to determine the truthfulness of these representations.

64.     Pershing made the initial inquiries but failed to disclose to Claimants that the information relating to SIB's underlying assets, income and cash flow were not available, or take the necessary steps to ensure Pershing's services were not being used as a key component to the perpetration of the massive Ponzi Scheme, at Claimants' expense. Pershing acted as though the

Page **20** of 41

asking of the question, without regard to the adequacy of the response by SIB, was sufficient to fulfill its duty of due diligence.

65.     In all events, the financial benefit received by Pershing from the fees earned from the transfer of funds to the SIB CDs, and Pershing's desire to have a future relationship with Allen Stanford as a company,  impacted and impaired its objective evaluation of the relevant risks and issues associated with the SIB CDs, and served as the motive for agreeing to serve as the clearing agent despite its knowledge that no one, including the investors, really knew the underlying assets supporting the SIB CDs or where the money was coming from to support the operation of SIB.  This conflict of interest between its role as clearing broker for Claimants and its desire to enhance profits for the Bank of New York resulted in substantial loss to the Claimants.

66.     Had the facts and circumstances known by Pershing at the time of the purchase or renewals been reported to Claimants, the existence of the Ponzi Scheme would have been apparent and Claimants would not have purchased or renewed the SIB CDs.  In the alternative, had the underlying value of the SIB CDs been determined by Pershing, the SIB CDs could have been liquidated prior to maturity and Claimants could have avoided some or all of their losses. In truth and in fact, an inquiry into the liquidity of SIB and the SIB CDs by Pershing would have shown that SIB had invested in illiquid investments or worthless assets, that most of the funds of SIB were being generated from South America and Latin America,  and that the only source  of income characterized as net profits by Stanford was the new funds being raised from other purchasers of SIB CDs in a giant Ponzi Scheme – not income from any investments as suggested to Claimants by the Offering Memoranda.

67. Because of the favorable commission structure and the fact that Pershing valued the income from its wire transfers to SIB, Pershing did not act on the clear evidence available to it to stem the tide of money flowing into the SIB CDs. The fees Pershing earned from Stanford also provided a powerful incentive for Pershing to turn a blind eye to the sales activities of the Investment Advisors.

68. Pershing had knowledge that the SIB CDs were being marketed to individual investors and account holders because that is one of the primary accounts from which Pershing transferred monies to SIB. Pershing had full knowledge that the services it was performing were directly for, and in connection with, the offering of the SIB CDs, and was an integral part of the process used by SGC and the Trust to promote and sell SIB CDs to clients in Louisiana, Texas, and elsewhere.

69. Pershing assisted and played a substantial role in SGC operation of the Ponzi Scheme in Louisiana and Texas and selling securities from, by, and through Louisiana and Texas, by means of the conduct described herein. With full knowledge that SGC and the Trust was selling securities from, by, and through Louisiana and Texas, Pershing perpetuated SGC, the Trust, and SIB's violations of the Louisiana Securities Laws and Texas Securities Laws by continuing to provide the assistance herein.

70. By their conduct described herein, Pershing participated with SGC, the Trust, and SIB in a fraudulent scheme, making Pershing responsible for providing a platform through which to effectuate the Ponzi Scheme. In particular, Pershing made the conscious decision to participate in the scheme by wire transferring Claimants' funds in order to assist and enable SGC and the Trust to continue to sell SIB CDs. Pershing's actions in participating in the fraudulent scheme are a proximate cause of actual damages to Claimants, being the difference between their

investments in the Trust as stated in their last account statement and the amount Claimants may receive from the Receivership distribution.

71.    Pershing ignored all of the warning signs discovered in its due diligence and assisted in the implementation and consummation of one of the largest Ponzi schemes in United States history, including the facts that:

   a.   No known track record existed for Stanford and SIB;

   b.   There was no confirmation of source of funds of SIB or SGC;

   c.   The bank was located on the island of Antigua with no real track record of regulating banks or expertise in examining banks;

   d.   SIB and SGC failed to deliver information to Pershing to confirm the existence of assets or source of income and cash flow;

   e.   The audit of SIB was being performed by a small, local, foreign CPA firm;

   f.   Interest rates of interest in excess of market were required by SIB to attract funds; and

   g.   Allen Stanford had a checkered past of problems with governmental agencies.

72.    A minimum effort by Pershing would have disclosed the house of cards. In truth and in fact, Pershing did not want to know the answer to the questions it was posing until it could firmly establish its relationship with Allen Stanford and as a matter of corporate strategy, avoided insisting on responses to these penetrating questions to insure the establishment of a future profitable relationship. By pursuing this course of conduct, Claimants became the "sacrificial lamb" for the potential profits of Pershing and its parent corporation, Bank of New York. Pershing chose to sacrifice Claimants' interests to realize the potential profits from its future relationship with Allen Stanford.

73.    Claimants first learned of Pershing's knowledge of the lack of financial transparency of the assets, income and cash flow of SIB and SGC as alleged herein based upon the testimony of Pershing at the enforcement proceeding entitled *In the Matter of Daniel Bogar, Bernerd E. Young, and Jason T. Green* that was held in Houston, Texas from February 11, 2013, through March 1, 2013.  The claim was timely filed because these document were under seal, and no discovery action could have been commenced to obtain the documents from Stanford based upon the court order of  Judge Godbey, District Judge for the U.S. District Court, Northern District of Texas.

## COUNT ONE
## BREACH OF FIDUCIARY DUTY

74.    Paragraphs 1 to 73 are incorporated herein by reference.

75.    Pershing breached the fiduciary duties owed to Claimants by Pershing. Pershing did not exercise reasonable care or competence in obtaining the accuracy of the  value of the underlying assets or the sources of income or cash flow of SIB given the high risk nature of the SIB CDs and the fact that SIB was an offshore bank located in a foreign country with little or no regulatory oversight.

76.    As custodian of the IRAs, Pershing owed a duty to Claimants to act fairly and in the utmost good faith in all of their transactions with Claimants, to make full and fair disclosure of all material facts to Claimants, to not take advantage of its relationship with the Claimants for personal gain, and to act openly and honestly regarding their transactions with Claimants.

77.    As the clearing account broker for all non-IRA Accounts, Pershing owed a duty to Claimants to act fairly and in the utmost good faith in all of their transactions with Claimants, to make full and fair disclosure of all material facts to Claimants, to not take advantage of its

relationship with the Claimants for personal gain, and to act openly and honestly regarding their transactions with Claimants.

78.     Pershing breached this fiduciary duty by agreeing to serve as the clearing broker for SGC when it knew of the lack of transparency in the underlying portfolio of SIB and the source of income and net cash flow of SIB. As the broker and clearinghouse for Claimants and as a member of FINRA, Pershing owed a duty to inform Claimants that SIB would not disclose to it the value of the underlying assets or the sources of income or cash flow of SIB given the high risk nature of the SIB CDs.

79.     Pershing breached this fiduciary duty by aiding Allen Stanford, SGC, and SIB in the conversion and wiring of Claimants' funds, proximately causing Claimants' losses and further perpetuating the Ponzi Scheme.  Pershing wired money into a "black hole of Calcutta" despite the continuous red flags uncovered in its due diligence efforts.

80.     In all events, the financial benefit received by Pershing from the fees earned from the transfer of funds to the SIB CDs, coupled with Pershing's desire to have a future relationship with Allen Stanford and the Stanford Entities, impacted and impaired Pershing's objective evaluation of the relevant risks and issues associated with the SIB CDs and served as the motive for agreeing to serve as the clearing agent despite its knowledge that no one, including the investors, really knew the what underlying assets supported the SIB CDs, nor where the money supporting the operation of SIB was coming from.  This conflict of interest between Pershing's role as clearing broker for Claimants and its desire to enhance profits to the Bank of New York resulted in substantial loss to the Claimants.

81.     Pershing violated its fiduciary duty when it placed its interest over that of its clients.  Despite its knowledge of the lack of transparency at SIB, Pershing looked out for its

own interest rather than the interests of the accounts for which it served as custodian. Pershing knew or should have known the breach of its fiduciary duties to Claimants would result in substantial losses to Claimants' portfolios.

82.     As a result of the foregoing breaches of fiduciary duty by Pershing, Claimants are entitled to actual damages in an amount to be shown at the arbitration of this matter.

## COUNT TWO
## BREACH OF CONTRACT

83.     Paragraphs 1 to 73 are incorporated herein by reference.

84.     A written agreement existed between Claimants, SGC, and Pershing, whereby Pershing would serve as custodian of SGC IRAs and for the account holder and clearing broker for marketable securities of individual and corporate customers of SGC. In addition, Pershing cleared funds from rollover IRAs that were transferred to the Trust in order to purchase SIB CDs and served as the clearing broker for funds for non-IRA accounts and wired funds on behalf of SGC and SIB to purchase SIB CDs in each Claimants' individual name. Further, Claimants were at all times third party beneficiaries of the contract between SGC and Pershing because Pershing knew the names of the Claimants that had accounts at Pershing, Pershing was aware of the services that is was performing on the account of each Claimant, and Pershing knew that Claimants would rely upon Pershing to reasonably and prudently perform this contract in accordance with the rules of FINRA, the anti-money laundering laws and regulations of the United States and the United States Treasury Department, and the state and federal securities law. Further, Pershing and Claimants agreed that Pershing would comply with the rules and regulations of FINRA in serving as the clearing broker for Claimants.

85.     As the broker and clearinghouse for Claimants and as a member of FINRA, an actual and implied agreement existed between Pershing and Claimants to perform the agreement

Page **26** of **41**

in accordance with the rules of FINRA, the anti-money laundering laws and regulations of the United States and the United States Treasury Department, and the state and federal securities law.

86.   Pershing breached the terms of this agreement by not properly evaluating the underlying securities and/or performing the necessary due diligence in regard to opening and maintaining Claimants' accounts for the other reasons alleged herein.  Pershing failed to obtain information which was material to Claimant's investment decision in the SIB CDs and failed to inform the Trust of the compensation arrangements between SGC and SIB.  In doing this, Pershing has breached a contract or contracts with Claimants.

87.   The actions or inactions of Pershing have further breached their implied duties of good faith and fair dealing.

88.   Claimants have been damaged by Pershing's material breaches of contract in an amount to be shown at the arbitration of this matter.

## COUNT THREE
## VIOLATION OF THE LOUISIANA SECURITIES ACT

89.   Paragraphs 1 to 73 are incorporated herein by reference.

90.   All persons who opened IRA accounts with SGC or the Trust bought and sold securities in Louisiana because the Trust, which was chartered under Louisiana Law and examined by the OFI, was located in Baton Rouge Louisiana. The trust was the purchaser of the SIB CD as custodian of the IRA account.

91.   All other Claimants, other than those referenced in Count Four, are domiciled in Louisiana and purchased securities in the state of Louisiana, or the Trust, which is domiciled in Louisiana, purchased the securities as custodian of the IRA account.

92.     Pershing has violated the Louisiana Securities Law, La. R.S. 51:701, *et seq.* (the "Act"), based upon Section 712(A) because it was a substantial factor in the sale of an unregistered security, and Section 714(B) as a participant in the sale of unregistered securities by the Trust and SGC.  Further, Pershing played a similar role in the sale of the SIB CDs as SGC. Pershing has also violated Section 712(D) of the Louisiana Securities law.

93.     The wire transfer of money for the purchase of the SIB CDs was the primary function performed by Pershing and was the primary if not the sole security that it was required to administer and transfer funds for. Obtaining a company to perform this role on behalf of the Trust was a key component in promoting the sale of SIB CDs to all Claimants including the retirees who rolled their IRAs over into the Trust as alleged herein.  Pershing received substantial income for performing this function.  Because this was the primary function performed by Pershing, Pershing had a heightened duty to understand the nature of the SIB CDs and to understand the manner in which the SIB CDs were being offered to Claimants and the manner in which they were valued on the reports rendered to Claimants.

94.     Pershing knew at all times that the SIB CDs were being marketed to Claimants, who in most instances were retirees, and that many of these individuals had rolled their IRA retirement funds into the IRA accounts that the Trust and Pershing administered. This knowledge was based upon the clearing function that Pershing was performing on behalf of the Trust. Further, Pershing knew that the Trust and SGC had not filed a registration statement with the state of Louisiana or the Securities and Exchange Commission because of its intimate involvement in the operations of the Trust.

95.     The Trust and SGC sold securities to Claimants, within the meaning of the terms "sale" and "security" as defined in Section 702 of the Louisiana Securities Law.  The Trust sold

these securities by means of untrue statements of material fact and/or omissions of material facts, which made their statements misleading in the light of the circumstances in which they were made. As a participant in the offering with knowledge of the registration process because of Pershing's deep involvement in the financial industry, Pershing made no attempt to determine the accuracy of the information that was being given to the Claimants by the Trust or to determine what information was omitted from the offering documents or whether the securities should have been registered, which would have required disclosure of the underlying assets of SIB.

96.    These misrepresentations and omissions were in violation of Section 712 of the Louisiana Securities Law.

97.    Pershing participated in the sale of securities that were not registered in accordance with the law of the state of Louisiana and were not subject to a private placement exemption under the laws of the state of Louisiana. Pershing participated in the sale of securities to Claimants who did not meet the non-public offering requirements and were not sophisticated investors.

98.    The failure to register the securities being marketed to Claimants was in violation of Sections 705 and 712 of the Louisiana Securities Law. Pershing is liable based upon Sections 714(A) and (B) of the Louisiana Securities Law. Pershing played a vital and substantial role in the sale and marketing of the unregistered SIB CDs to the Claimants. Had the securities been registered, the underlying assets of SIB would have been disclosed, and Claimants would have been able to make an informed decision on the value of the SIB CDs.

99.    Claimants relied on the foregoing material representations and/or omissions to their detriment.

Page 29 of 41

100.    Pershing intentionally turned a blind eye to the lack of transparency of SIB as to the value of the assets supporting the SIB CDs and source of income and cash flow of SIB, and knew of the inaccuracies in the written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Pershing is liable under Sections 712(A) and 712(D) of the Louisiana Securities Law.

101.    Pershing could have discovered all of the misrepresentations and omissions including the failure to register the SIB CDs by exercising the requisite due care require under 714(B) of the Louisiana Securities Law.

102.    In accordance Section 714(B) of the Louisiana Securities Law, every company who participates in any material way in the sale is liable jointly and severally with and to the same extent as the person liable under 714(A) of the Act unless the person whose liability arises under 714(B) sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist. Under 714(B) of the Louisiana Securities Law, Pershing's role constitutes participation in the offering in a material way based upon the allegations set forth herein and is therefore jointly and severally liable.

103.    Pershing could have, in the exercise of reasonable care, determined the existence of the facts set forth in Paragraphs 1 to 88 or in the alternative, determined the omission of certain facts that was making the offering of the SIB CDs misleading. Pershing at all times knew that the information contained in the Offering Memorandum of SIB was incomplete, lacked

financial transparency and omitted material information concerning the value of the underlying assets and the source of the income and cash flow of SIB, because SIB and SGC failed to deliver to Pershing the very type of information that should have been included in the Offering Memorandum, and if it had been included, would have shown the existence of a Ponzi Scheme.

104.    As a result of the foregoing violations of the Louisiana Securities Law, Claimants are entitled to all damages allowed under La. R.S. 51:714(a) including actual damages and reasonable attorney fees, and are entitled to damages in an amount to be shown at the arbitration of this matter.

## COUNT FOUR
## VIOLATION OF THE TEXAS SECURITIES ACT

105.    Paragraphs 1 through 73 are incorporated herein by reference.

106.    This section pertains to any securities that were bought by any persons domiciled in Texas that were purchased by any person other than the Stanford Trust. These Claims arise under the Texas Securities Act, Tex. Cv. Code Ann. § 581-1, *et seq.*

107.    Pershing has violated the Texas Securities Act because it was a substantial factor in the sale of an unregistered security and a participant in the sale of unregistered securities. Further, Pershing played a similar role in the sale of the security as SGC.

108.    The wire transfer of money for the purchase of the SIB CDs was the primary function performed by Pershing and was the primary if not the sole security that it was required to administer and transfer funds for. Obtaining a company to perform this role on behalf of the Trust was a key component in promoting the sale of SIB CDs to all Claimants including the retirees who rolled their IRAs over into the Trust as alleged herein. Pershing received substantial income for performing this function. Because this was the primary function performed by Pershing, Pershing had a heightened duty to understand the nature of the SIB CDs and to

understand the manner in which the SIB CDs were being offered to Claimants and the manner in which they were valued on the reports rendered to Claimants.

109.    Pershing knew at all times that the SIB CDs were being marketed to Claimants, who in most instances were retirees. This knowledge was based upon the clearing function that it was performing on behalf of the Trust. Further, Pershing knew that SGC had not filed a registration statement with the state of Texas or the Securities and Exchange Commission. Further, Pershing knew that the Trust was experiencing major internal control issues based upon its due diligence inquiries in 2005, and continuing inquiries through 2008, but made no attempt to assure that the Claimants were aware of these issues.

110.    Pershing knew that the SIB CDs were being sold to Claimants through an integrated public offering without being properly registered as securities as required under both SEC and the Texas Securities Act. This public offering was in violation of Article 581-1, *et seq.*, of the Texas Securities Act.    The Trust and SGC sold securities to Claimants, within the meaning of the terms "sale" and "security" as defined in Section 581-4 of the Texas Securities Act. These securities were sold by means of untrue statements of material fact and/or omissions of material facts, which made their statements misleading in the light of the circumstances in which they were made.   As a participant in the offering, and with knowledge of the registration process because of Pershing's deep involvement in the financial industry, Pershing made no attempt to determine the accuracy of the information that was being given to the Claimants by SGC or to determine what information was omitted from the offering documents or whether the securities should have been registered which would have required disclosure of the underlying assets of SIB.   This reckless disregard for the truth or the law materially aided SGC and the

Trust, making Pershing jointly and severally liable with the sellers of the SIB CDs to the same extent as if Pershing were the seller or issuer of the CDs.

111.    These misrepresentations and omissions were in violation of the Texas Securities Act.

112.    Pershing participated in the sale of securities that were not registered in accordance with the law of the state of Texas and were not subject to a private placement exemption under the laws of the state of Texas.  Pershing participated in the sale of securities to Claimants who did not meet the non-public offering requirements and were not sophisticated investors.

113.    The failure to register the securities being marketed to Claimants was in violation of Sections 581-12(A), 33(A)(1), and 33(F)(2), of the Texas Securities Act.  Pershing played a vital and substantial role in the sale and marketing of the unregistered SIB CDs to the Claimants. Had the securities been registered, the assets of SIB would have been disclosed, and Claimants would have been able to make an informed decision on the value of the SIB CDs.

114.    Claimants relied on the foregoing material representations and/or omissions to their detriment.

115.    Pershing willingly and knowingly turned a blind eye to the written offering documents, promotional materials, investor and other correspondence, and oral presentations, which contained untrue statements of material facts and misrepresentations of material facts, and which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Pershing is jointly and severally liable under Section 581-33(F)(2) of the Texas Securities Act.

116.   Pershing could have discovered all of the misrepresentations and omissions including the failure to register the SIB CDs by exercising the requisite due care required under the Texas Securities Act.

117.   The Texas Securities Act provides that every company who offers or sells a security, either directly or through agents, in violation of the Texas Securities Act is jointly and severally liable to the person buying the security unless the person whose liability arises under Section 581-33 of the Texas Securities Act sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist.  Pershing participated in the offering in a material way based upon the allegations set forth herein and is jointly and severally liable.

118.   Pershing "aided and abetted" a sale of the SIB securities based upon the allegations set forth herein and such actions on their behalf enabled the Ponzi Scheme and constituted willful negligence and a reckless disregard for the truth. Pershing conspired with SIB and SGC to violate the Texas Securities Act.  Pershing at all times knew that the information contained in the Offering Memorandum of SIB was incomplete, lacked financial transparency, and omitted material information concerning the value of the underlying assets and the source of the income and cash flow of SIB, because SIB and SGC failed to deliver to Pershing the very type of information that should have been included in the Offering Memorandum, and if it had been included, would have shown the existence of a Ponzi Scheme.

119.   As a result of the foregoing violations of the Texas Securities Act, Claimants have sustained actual damages and are entitled to damages and reasonable attorney fees in an amount to be shown at the arbitration of this matter.

### COUNT FIVE
### PERSHING
### THIRD PARTY BENEFICIARY CLAIMS

120.     Claimants incorporate by reference each and every allegation contained in paragraphs 1 through 73 and paragraphs 83 to 88, above, as though fully set forth herein.

121.     Pershing entered into a binding and valid contract with SGC to provide broker clearing and fund and wire transfer services for the benefit of Claimants.  The Claimants were third party beneficiaries of the contracts between Pershing and SGC.

122.     Pershing was retained by SGC in order to provide these clearing and fund transfer services.

123.     Upon information and belief, the services provided by Pershing pursuant to the Clearing Agreement, as alleged more fully above, included, but were not limited to: communicating with Claimants; maintaining the record of accounts; processing subscriptions and withdrawals; preparing and maintaining SIB's financial and accounting records and statements; calculating investors' capital account balance (on a monthly basis); and preparing financial statements.

124.     These services were uniquely provided to and for the benefit of Claimants as the holder of the SIB CDs, which were a substantial part of the capital of SGC and the Stanford Entities.

125.     The Claimants understood that Pershing would be providing these services for their benefit.

126.     Pershing understood that Claimants would be relying on Pershing to perform their contractual obligations for the benefit of Claimants.

127.     Pershing knew that with respect to certain of the financial information it

maintained on behalf of Claimants, Pershing was the only source for that information and knew that Claimants relied on Pershing so as to permit Claimants to form decisions with respect to maintaining their investment in the SIB CDs.

128.   The Claimants had a right, under the circumstances of the contract, to expect Pershing's performance for Claimants' benefit and Pershing understood that the Claimants were the immediate object of the performance of Pershing's contractual obligations such that Pershing has a duty to compensate Claimants for Pershing's failure to perform its obligations to Claimants as set forth above more fully.

129.   Pershing, as the clearing and money transfer broker for SGC, owed the Claimants a duty to exercise reasonable care in the performance of their duties as administrators because Claimants were third party beneficiaries to the contract.

130.   The agreement of Pershing to serve as the clearing broker for SGC provided a benefit to Claimants as the third party and was a condition to the investment of Claimants.

131.   The clearing broker contract executed by Pershing provided a direct benefit to Claimants and formed the condition or consideration of such contract.

132.   Pershing knew that Claimants would rely on Pershing's due diligence performance in analyzing the investment in the SIB CDs as well as the basis for determining the equity of SIB and SGC, and the analysis of whether Claimants should redeem their SIB CDs.

133.   The breaches by Pershing of its duties of care owed to Claimants directly and/or proximately caused damages to Claimants. The breaches by Pershing include the misrepresentations and omissions as alleged more fully above.

134.   Pershing breached its duties to the Claimants, as third party beneficiaries of the Clearing Agreement, at all times between the date Pershing began clearing funds for the

Page 36 of 41

purchase of SIB CDs after December 27, 2005 until the resignation of Pershing as the SGC clearinghouse in December 2008, by failing to perform the requisite services and due diligence in accordance with the standard of reasonable care required of financial companies and securities brokers for the reasons alleged herein.

135.    Because of Pershing's breach of its contractual duties owed to Claimants as third party beneficiaries of the Clearing Agreement, the Claimants are entitled to an award of compensatory damages against Pershing in an amount to be determined at the arbitration of this matter.

**COUNT SIX**
**FRAUD**

136.    Paragraphs 1 through 73 are incorporated herein by reference.

137.    Pershing failed to disclose to Claimants its knowledge of the lack of transparency of the assets of SIB or the lack of transparency of the assets and the source of earnings and net cash flow of SIB.

138.    In truth and in fact, Pershing did not want to know the answer to the questions it was posing until it could firmly establish its relationship with Stanford and as a matter of corporate strategy, avoided insisting on responses to these penetrating questions to insure the establishment of a future profitable relationship.

139.    If the omissions had been disclosed to Claimants, then Claimants would not have purchased the SIB CDs.

140.    Pershing had a duty to Claimants to disclose the information as alleged herein.

141.    The failure to disclose the information alleged herein has caused significant losses to the Claimants.

142. Further, the Claimants have been damaged by Pershing's failure to disclose the information as alleged above.

## COUNT SEVEN
## PERSHING
## NEGLIGENT MISREPRESENTATION

143. Paragraphs 1 through 73 are incorporated herein by reference.

144. Pershing negligently failed to inform Claimants of the fact that SIB would not disclose the underlying assets of the SIB CDs or the source of income or cash flow of SIB. Pershing knew that Claimants would rely on its statements, omissions, and/or conduct.

145. In truth and in fact, Pershing did not want to know the answer to the questions it was posing until it could firmly establish its relationship with Stanford and as a matter of corporate strategy, avoided insisting on responses to these penetrating questions to insure the establishment of a future profitable relationship.

146. If the omissions had been disclosed to Claimants, then Claimants would not have purchase the SIB CDs.

147. Pershing had a duty to Claimants to disclose the information alleged herein.

148. The failure to disclose the information alleged herein has caused significant losses to the Claimants.

149. Further, the Claimants have been damaged by Pershing's failure to disclose the information as alleged above.

150. The negligent misrepresentations have resulted in damages to Claimants, as alleged herein.

## DAMAGES OWING BY PERSHING

151.    Paragraphs 1 through 150 are incorporated herein by reference.

152.    Claimants are entitled to rescission of the purchase of their respective SIB CDs, plus interest, from the date of purchase. In the alternative, Claimants are entitled to the damages allowed pursuant to La. R.S. 51:714(a) or the amounts allowed under the Texas Securities Act including reasonable attorney fees.

153.    In the alternative, in the event rescission of the sale is not allowed, Claimants have suffered substantial financial injury equal to the purchase price of the SIB CD, plus accrued and unpaid interest, minus the current value of the SIB CD which Claimants believe to be worthless. In addition to the general damages flowing directly from these breaches, Claimants are entitled to recover consequential, incidental and special damages, lost profits, lost opportunities, loss in value of the SIB CD and other economic damages.

154.    Almost all Claimants are older adults, who are no longer gainfully employed, making their prospects of replacing the retirement monies lost virtually nonexistent and leaving Claimants with substantially reduced means for their continued sustenance.

## REQUEST FOR ALL PUBLIC PANEL

155.    Claimants hereby elect to proceed under the Optional All Public Panel for arbitration.  FINRA Code of Arbitration Procedure for Customer Disputes article 12403(a) states that "The customer may elect to proceed with panel composition under either of the following options: (1) Composition Rules for Majority Public Panel... (2) Composition Rules for Optional All Public Panel." Accordingly, Claimants hereby elect to proceed under the Optional All Public Panel.

## HEARING LOCATION

156.    Claimants request that the arbitration hearing be held in Baton Rouge, Louisiana. Most Claimants live in or near Baton Rouge, Louisiana, one of the epicenters of the Stanford Ponzi Scheme. Furthermore, Claimants are primarily elderly retirees who may have difficulty traveling to a distant hearing location. Lastly, counsel for Claimants is able to secure a sufficient, neutral location in Baton Rouge, Louisiana in which to conduct the arbitration. In the alternative, Claimants request New Orleans, Louisiana as the arbitration location in the event arbitration cannot be held in Baton Rouge, Louisiana.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Claimants, as listed on **Exhibit A** attached herein, pray for the following:

A.    that Pershing, LLC be cited to appear and answer;

B.    that the sale of the SIB CDs to claimants be rescinded, and that the purchase price plus interest be returned to claimants;

C.    that, upon arbitration, Claimants recover actual damages equal to the purchase price of the SIB CD minus the current value of the SIB CD;

D.    that, upon arbitration, Claimants recover attorneys' fees, prejudgment interest, post judgment interest, costs of arbitration, and such other and further relief to which Claimants may be justly entitled; and

E.    for all other equitable and legal relief as the arbitrators deem just and appropriate.

Respectfully submitted:

**PREIS GORDON, APLC**

/s/ Phillip W. Preis
Phillip W. Preis, Bar Roll No. 10706
Charles M. Gordon, Jr., Bar Roll No. 23758
Crystal D. Burkhalter, Bar Roll No. 27396
Caroline P. Graham, Bar Roll No. 31295
Charles Matthew Thompson, Bar Roll No. 32728
Jennifer R. Dietz, Bar Roll No. 33804
John N. Grinton, Bar Roll No. 34571
2150 Bank One Centre - North Tower
450 Laurel Street (70801-1817)
Post Office Box 2786 (70821-2786)
Baton Rouge, LA
Telephone: (225) 387-0707
Facsimile: (225) 344-0510

**PLEASE SERVE PERSHING, LLC**

# Exhibit A: Claimants appearing individually and on behalf of accounts listed herein

| Plaintiff | On behalf of Account |
|---|---|
| Baumann, Mamie Helen (Mamie C. Sanchez as power of attorney for Mamie Helen Baumann) | Mamie Helen Baumann |
| Beauchamp, Royce E. | Royce E. Beauchamp IRA |
| Becker, Joseph | Joseph R. Becker |
| Benton B Johnson Test TR II (AmeriTrust Corporation, as Trustee on behalf of Benton B Johnson Test TR II) | Benton B Johnson Test TR II- SAS; STSGC20072D/C |
| Benton Bruce Johnson Trust #1 (AmeriTrust Corporation, as Trustee on behalf of Benton Bruce Johnson #1) | Benton Bruce Johnson Trust #1 |
| Beven, Terence and Elizabeth | Terence or Elizabeth Beven; Terence Beven IRA |
| Bevis, Wanda | Wanda Bevis IRA |
| Bowden, Thomas "Eddie" | Thomas E. Bowden SEP IRA; T.E. Bowden Sr. Ret. Trust |
| Boyd, Linda | Jerry W Boyd or Linda S Boyd |
| Burris, Jerry | Jerry M. Burris IRA |
| Carter, Anita Ellen | Anita Ellen Carter |
| Chisholm, Jim | Clyde J. Chisholm IRA |
| Comeaux, Patrick | Patrick J. Comeaux IRA |
| D'Amore, Mallory Chastant (Paige) | Mallory Chastant D'Amore |
| D'Amore, Ralph | Ralph Daniel D'Amore MD A Processional Corp; Ralph D. D'Amore IRA |
| Daniel, Carolyn H. | Carolyn H. Daniel IRA |
| Daniel, F. Kenneth ("Ken") | F. Kenneth Daniel and Carolyn H. Daniel; F. Kenneth Daniel IRA |
| Danielson, Roderick ("Rod") | Roderick L. Danielson |
| Dawson, William | William C. Dawson IRA |
| Dehay, Wallace L. ("Kelly") Jr. | Wallace L. Dehay IRA |
| Demarest, Fred | Fred R. Demarest IRA |
| Dore, Cindy | Cynthia R. Dore Separate Property |
| Dumestre, Marcel and Margaret | Marcel J Dumestre Jr. or Margaret Dumestre |
| Farr, Leah | Leah S Farr IRA |
| Feldman, Robert E. (Dr.) | Robert E. Feldman |
| Fischer, Martin J. | Martin J. Fischer |
| Forbes, Deborah | Deborah S. Forbes IRA |

EXHIBIT A ALL-STATE LEGAL®

| Plaintiff | On behalf of Account |
|---|---|
| Forbes, Kendall | George Kendall Forbes; G. Kendall Forbes IRA |
| Gautreaux, Russell Shane | Russell Shane Gautreaux |
| Gentry, Cindy L. | Tommy G. Gentry and Cindy L. Gentry; STC Custodian FBO Cindy L. Gentry IRA; International Bank and Trust Company FBO Cindy Gentry IRA 33-51226 |
| Gentry, Tommy G. | IRA FBO Tommy Gene Gentry (Pershing as Custodian); STC Custodian FBO Tommy G. Gentry IRA; Tommy G. Gentry and Cindy L. Gentry |
| Giambrone, May | Michael J Giambrone or May L Giambrone |
| Gildersleeve, Lynn | Lynn G. Gildersleeve Bene IRA; Lynn G. Gildersleeve; AKA Lynn Gildersleeve Michelli Intervivos Trust |
| Gildersleeve, Robert | Robert V. Gildersleeve Bene IRA; Robert Gildersleeve Jr Trust Intervivos Trust |
| Gill, Gordon | Gordon C. Gill IRA |
| Gill, Nancy | Nancy N Gill |
| Goeckel, Jon K. | Jon K. Goeckel IRA; Jon K Goeckel and Loretta B Goeckel |
| Goeckel, Loretta B | IRA FBO Loretta B Goeckel; Jon K Goeckel and Loretta B Goeckel |
| Graham, Jason | Jason Scott Graham |
| Graham, Robert | Robert E. Graham |
| Gruenwald, Charles (Dr.) | Charles Gruenwald, Jr. |
| Hallman, Barney L. | Barney L. Hallman IRA |
| Haney, Patrick | Patrick Haney |
| Hart, Charles | Charles Hart IRA 33-51202; Charles Hart IRA STSGC41251 |
| Hebert, Patsy | Patsy J. Hebert |
| Hutcherson, John R. | John R. Hutcherson IRA |
| Kenaley, Donald H. | Donald H. Kenaley IRA |
| Kiebach, Thomas | Thomas J. Kiebach |
| Landers, Don | Don G. Landers; Don G. Landers IRA |
| Landry, Daniel and Dianna | Daniel P Landry or Dianna Lynn Landry; Daniel P. Landry IRA |
| Laplante, Merrill | Merrill L Laplante |
| Magee, Greg | Gregory A. Magee IRA |
| Mark Calvin Johnson Trust #1 (AmeriTrust Corporation, as Trustee on behalf of Mark Calvin Johnson Trust #1) | Mark Calvin Johnson Trust #1 |
| Marquette, Claude | Claude J. Marquette IRA |

| Plaintiff | On behalf of Account |
|---|---|
| Marston, Ronald | Ronald R. Marston IRA; |
| Martha JC Johnson Gen Skpg Tr (AmeriTrust Corporation, as Trustee on behalf of Martha JC Johnson Gen Skpg Tr) | Martha JC Johnson Gen Skpg Tr- SAS |
| Mayhall, Jean Anne | Jean Anne Mayhall |
| Mayhall, Jean Anne and John Wade (on behalf of Microchip ID Systems Pension Fund) | Microchip ID Services INC Retirement Plan |
| Melilli, Kathleen | Kathleen F. Melilli IRA |
| Mier, Kathleen S. | Kathleen S. Mier IRA |
| Mier, Louis | Louis Mier Jr IRA |
| Millet, Jacqueline | Jacqueline A. Millet IRA |
| Nix, Bobby | STC Custodian FBO Bobby J. Nix IRA |
| Nix, Margaret | Margaret S. Nix IRA |
| Oliver, Kirk R. | Kirk R. Oliver or Mary C. Oliver; Kirk R. Oliver IRA |
| Oliver, Mary C. | Mary C. Oliver IRA; Kirk R. Oliver or Mary C. Oliver |
| Ordoyne, Arthur | Arthur J. Ordoyne IRA |
| Ordoyne, Lonnie | Lonnie P. Ordoyne IRA |
| O'Rear, Bennie and Claudia | Bennie M. O'Rear and Claudia P. O'Rear |
| Paternostro, Mary Ann | Angelo A. Paternostro or Mary Ann Paternostro |
| Philippe, Lynn | Lynn J. Philippe IRA; Lynn J Philippe; Joseph H Philippe or Lynn J Philippe |
| Phillips, William | William E. Phillips |
| Power Packing Co. Inc. Agency | Power Packing Co. Inc. Agency |
| Rathbone, Monroe J. (IV) | Monroe J. Rathbone IV; Monroe J. Rathbone IV IRA |
| Rathbone, Richard (Dr.) | Richard F. Rathbone; Richard F. Rathbone IRA |
| Roland, James and Susan | James W. Roland and Susan S. Roland |
| Romig, Jessie | Jessie Romig |
| Savoy, Julie | Julie Savoy IRA |
| Schwendimann, Holly | Holly B. Schwendimann |
| Schwendimann, Robert | John R. Schwendimann IRA |
| Sklar, Howard | As Trustee obo Albert Sklar Qtip Trust FBO Howard Fred Sklar; As Trustee obo Albert Sklar Qtip Trust FBO Judy Sklar; As Trustee obo Albert Sklar Qtip Trust FBO Suzanne Irene |
| Smith, Bruce P. | Bruce P. Smith |
| Smith, G. Rogers or Harriet | G Rogers Smith or Harriet S Smith |

| Plaintiff | On behalf of Account |
|---|---|
| Smith, Robert | Robert E. Smith, Jr. IRA; Robert E. Smith or Carolyn Smith |
| Starkey, Rodney | Rodney P. Starkey IRA |
| Stegall, Carol H. and James | James H Stegall or Carol H Stegall; James H. Stegall IRA |
| Stone, Walter Bruce | Walter B. Stone IRA |
| Sumpter, Romina | Romina Adalgiza Sumpter |
| Tarver, Terry | STC Custodian FBO Terry Tarver IRA; Terry Tarver IRA |
| Tarver, Terry | STC Custodian FBO Terry Tarver IRA |
| Teller, Fred | STC Custodian FBO Fred Teller IRA |
| Unglesby, Gail and Lewis | Gail H Unglesby |
| Wade, John | John R. Wade |
| White, Charles | Charles L. White IRA |
| Wilkewitz, Ken | Kenneth G. Wilkewitz IRA |
| Wilson, Stephen | Bone and Joint Clinic FBO Stephen M Wilson |
| Witmer, Martha | Martha J Witmer |
| Witmer, Sharon | Sharon J. Witmer IRA |